<pre>
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                               - - -

 4
        ZAPFRAUD, INC.,              :   CIVIL ACTION
 5                                   :
                    Plaintiff,       :
 6                                   :
            vs.                      :
 7                                   :
        BARRACUDA NETWORKS, INC.,    :
 8                                   :
                    Defendant.       :   NO. 19-1687-CFC-CJB
 9      ---------------------------  :
        ZAPFRAUD, INC.,              :   CIVIL ACTION
10                                   :
                    Plaintiff,       :
11                                   :
            vs.                      :
12                                   :
        FIREEYE, INC.,               :
13                                   :
                    Defendant        :   NO. 19-1688-CFC
14

15                               - - -

16                              Wilmington, Delaware
                                Friday, September 18, 2020
17                              11:18 o'clock, a.m.
                                ***Zoom Conference
18
19                               - - -

20      BEFORE:  HONORABLE CHRISTOPHER J. BURKE, U.S.D.C.J.

21                               - - -

22

23

24                              Valerie J. Gunning
                                Official Court Reporter
25
</pre>

```
1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                                  - - -

4      ZAPFRAUD, INC.,                :    CIVIL ACTION
                                      :
5                    Plaintiff,       :
                                      :
6           vs.                       :
                                      :
7      MIMECAST NORTH AMERICA,        :
       INC.,                          :
8                                     :
                     Defendant.       :    NO. 19-1690-CFC
9      ---------------------------    :
       ZAPFRAUD, INC.,                :    CIVIL ACTION
10                                    :
                     Plaintiff,       :
11                                    :
            vs.                       :
12                                    :
       PROOFPOINT, INC.,              :
13                                    :
                     Defendant.       :    NO. 16-1691-CFC
14

15                                 - - -

16

17

18

19

20

21

22

23

24

25
```

1    APPEARANCES:

2

3                    FARNAN LLP
                     BY:  MICHAEL J. FARNAN, ESQ.

4
                            -and-
5

6                    DESMARAIS LLP
                     BY:   JONAS McDAVIT, ESQ.,
7                          WEN XUE, ESQ. and
                           WILLIAM YAU, ESQ.
8                          (New York, New York)

9
                           Counsel for Plaintiff
10                         ZapFraud, Inc.

11

12                   MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                     BY:  MICHAEL FLYNN, ESQ.
13

14                          -and-

15

                     RIMON P.C.
16                   BY:  KARINEH KHACHATOURIAN, ESQ.
                          (Palo Alto, California)
17

18                         Counsel for Defendant
                           Barracuda Networks
19

20

                     MORRIS, NICHOLS, ARSHT & TUNNELL LLP
21                   BY:   JACK B. BLUMENFELD, ESQ. and
                           JENNIFER A. WARD, ESQ.
22

23                         Counsel for Defendants
                           FireEye, Inc. and Mimecast North America,
24                         Mimecast UK Limited and Mimecast Services,
                           Ltd.
25

```
 1   APPEARANCES (Continued):

 2
                     DURIE TANGRI LLP
 3                   BY:  JOSEPH C. GRATZ, ESQ.,
                          MATTHAEUS H. MARTINO-WEINHARDT, ESQ. and
 4                        ANNIE LEE, ESQ.
                          (San Francisco, California)
 5

 6                        Counsel for Defendant
                          FireEye, Inc.
 7

 8
                     LATHAM & WATKINS LLP
 9                   BY:  MAXIMILIAN A. GRANT, ESQ.
                          GABRIEL K. BELL, ESQ. and
10                        DIANE GHRIST, ESQ.
                          (Washington, D.C.)
11

12                           -and-

13
                     LATHAM & WATKINS LLP
14                   BY:  RICHARD G. FRENKEL, ESQ.
                          (Silicon Valley, California)
15

16                        Counsel for Defendants
                          Mimecast North America,
17                        Mimecast UK Limited and Mimecast Services,
                          Ltd.
18

19                   SHAW KELLER LLP
                     BY:  KAREN E. KELLER, ESQ.
20

21                           -and-

22

23

24

25
```

1    APPEARANCES (Continued):

2

3            WINSTON & STRAWN
             BY:  KATHERINE VIDAL, ESQ. and
4                 MICHAEL R. RUECKHEIM, ESQ.
                  (Menlo Park, California)
5

6                 Counsel for Defendant
                  Proofpoint, Inc.
7

8                      -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2

3              (The Zoom conference was held beginning at 11:18

4     a.m.)

5

6              THE COURT:  All right.  And this is Judge Burke,

7     everyone.  I will get back on now and I think we have both

8     our court reporter with us and all our counsel on the line,

9     so with that, let's go on the record.

10              And I will say that we're here on the record

11     today in a number of different related civil cases, the

12     first of which is Civil Action No. 19-1687 in our Court.  In

13     that case, the plaintiff is, as it is in all of the cases,

14     is ZapFraud, Inc., and the defendant is Barracuda Networks,

15     Inc.

16              We also have three other related cases that are

17     participating in our hearing today.  We have Civil Action

18     No. 19-1688.  In that case, the defendant is FireEye.

19              We have Civil Action No. 19-1690, where the

20     defendants are Mimecast North America, Inc., Mimecast U.K.

21     Limited and Mimecast Services Ltd.  We'll call them Mimecast

22     defendants.

23              And then we have Civil Action No. 19-1691, in

24     which case the defendant is Proofpoint, Inc.

25              And we're here for argument today on motions to

1    dismiss filed in the respective cases.  A number of those

2    motions raise issues regarding Section 101 and one of the

3    motions raises other pleading issues with regard to claims

4    of indirect infringement and willful infringement in the

5    Barracuda case, the 1687 case.

6              With that prelude, in just a second I'm going to

7    ask counsel for each side to identify themselves, but before

8    I do, let me just say a couple of things about kind of

9    protocol for the video conference.  And in that regard, what

10   I would suggest first is having done this a few times is

11   that other than if counsel is speaking, or any counsel on

12   the line or participant on the line, if you are not

13   speaking, if you would mute your line so that in case there

14   is any background noise where you are, we don't hear it all

15   during the video conference.

16             Second, sometimes counsel ask me if I have a

17   preference as to whether or not if they aren't speaking or

18   they're not the counsel who is participating in the

19   argument, whether they keep their video on or turn their

20   video off, and the answer is I don't have a preference.  The

21   only thing I would ask is if you're counsel who is actually

22   participating in the argument we're having, I ask you to

23   keep your video on while we're having argument on that

24   motion, but otherwise you can feel free to turn it off if

25   you are just listening in on the argument or if the argument

1    is as to your motion is over.

2            Thirdly, I should say sometimes folks want to

3    share their screen to show me their slides arched and is

4    fine.  You can feel free to do that if you want to.  I

5    should say though occasionally when people do that, there

6    are some glitches in the technology, and so if you decide

7    that you don't want to do that, or you start sharing your

8    screen and it does not work out, I have copies of all of the

9    slide presentations that the parties have provided to me and

10   I have separate computer with me where I can pull those up

11   and just go through them on a page-by-page basis.  So it's

12   perfectly fine if you say what I'm going to do is I'm going

13   to keep my face in the video and I will tell you what slide

14   I'm on and you can just go you through your slides and I can

15   follow along that way.  That's perfectly fine.  That's up to

16   you.

17           Lastly, if at any point you have any trouble

18   seeing me or hearing me, just let me know.  Hopefully, our

19   connection will be a good one.

20           I've allocated some time for the respective

21   arguments, 45 minutes a side for the Section 101 arguments

22   and 20 minutes aside for the other pleadings in the

23   Barracuda case.

24           We'll try to keep track of time on our end and I

25   will let counsel know where they're down to the point where

1    they have about five or ten minutes left in their respective

2    arguments.

3            All right.  With those kind of ground rules laid

4    out, let's have counsel identify themselves for the record

5    in their respective case.  We'll start first with counsel

6    for the plaintiff's side and we'll begin there with Delaware

7    counsel.

8            Do we have Delaware counsel for the plaintiff's

9    side?

10           MR. McDAVIT:  Your Honor, this is Jonas McDavit

11   for ZapFraud.  I believe our Delaware counsel, Michael

12   Farnan, is muted right now.

13           (Pause.)

14           MR. McDAVIT:  Your Honor, I'm not sure if

15   you can hear me.  We might be having some technical

16   difficulties to ensure that everyone can speak on the Skype

17   meetings app.

18           THE COURT:  Counsel, it's Judge Burke here.

19           MR. McDAVIT:  Judge, this is Jonas McDavit for

20   ZapFraud.  Our Delaware counsel, Michael Farnan, is on the

21   line.  I think he's just having problems communicating with

22   you.

23           I can tell you from our side who is on the line

24   right now.  It's Dr. Jakobsson, who is the inventor of the

25   patents, myself, Jonas McDavit, Wen Xue and Will Yau from

1    Desmarais LP for outside counsel in this matter, and Michael

2    Farnan, who is our Delaware counsel.

3                THE COURT:  All right.  Thank you, Mr. McDavit.

4    I also just had some connection problems.  It's strange.

5    Normally, the Skype for Business video conference link goes

6    pretty well, so hopefully, it's a one-time thing, but I can

7    hear you well now, and thank you for introducing the folks

8    on your side.  Let's cross our fingers and hope things go

9    well from here.

10                I will turn to defendant Barracuda Networks,

11    Inc.  Again, we'll begin with Delaware counsel for

12    introductions.

13                MR. FLYNN:  Good afternoon, Your Honor.  It's

14    Michael Flynn from Morris Nichols, and with me on the line

15    is Karineh Khachatourian from Rimon PC in Palo Alto.

16                THE COURT:  All right.  Good to welcome you all.

17                Next, let's see.  In terms of order in the case,

18    I think the next defendant is FireyEye, Inc.  Again, we'll

19    start with Delaware counsel.

20                MS. WARD:  Good morning, Your Honor.  On behalf

21    of FireEye, this is Jennifer Ward from Morris Nichols.  Jack

22    Blumenfeld is also on.

23                And then we have from Durie Tangri, Joseph

24    Gratz, Matthaeus Martino-Weinhart and Annie Lee, and then we

25    also have a client representative, Gary Ross, from FireEye.

1      THE COURT:  All right.  Thank you.

2           And we'll do the same for the Mimecast

3   defendants, again, beginning with Delaware counsel.

4           MS. WARD:  And for Mimecast again, it's Jennifer

5   Ward and Jack Blumenfeld from Morris Nichols.  And then from

6   Latham & Watkins we have Max Grant, Rick Frenkel and Diane

7   Ghrist, and then from Mimecast we have Robert Knoll and

8   Christopher Dahli.

9           THE COURT:  Okay.  Too fast for me to write down

10  their names, but I will ask who is going to speak, so no

11  worries.  We have it for the record.

12          Lastly, for the 1691 case, let's have defendants

13  introduce themselves for the record there.  I'm sorry.

14          Do we have folks -- is Proofpoint the defendant

15  in 1691?  Do we not have counsel on for that defendant?  I

16  think Shaw Keller may be local counsel.  Maybe they are

17  having connectivity issues.

18          Ms. Ward, can you still hear me?

19          MS. WARD:  I can still hear you.

20          MR. DIALS:  Your Honor, can you hear me?  I'm

21  in-house counsel with Proofpoint and we have a few people on

22  I know, so I am not sure why you can't hear them.

23          THE COURT:  All right.  Mr. Dials, it's unusual,

24  but why don't you do the introductions.

25          MR. DIALS:  Okay.  I believe we have for outside

1    counsel at Winston & Strawn, Kathi Vidal and William Logan.

2            THE COURT:  Okay.

3            MR. DIALS:  Latham will be doing most of the

4    presenting and I don't have the names, the Latham firm

5    representing Mimecast.

6            THE COURT:  Right.  Mr. Dials, Mr. Logan, can

7    you see me and hear me?

8            MR. LOGAN:  Yes, Your Honor.  This is Mr. Logan.

9    I believe local counsel is having some technical issues, but

10   we are here, Winston & Strawn.  Kathi Vidal, William Logan,

11   we are present.

12           MR. DIALS:  William, is Mike Rueckheim on as

13   well?

14           MR. LOGAN:  Mike Rueckheim is here as well, but

15   I don't believe he'll be presenting today.

16           THE COURT:  Fair enough.  I can see we've got

17   folks on.  I think Karen Keller is on from Shaw Keller, but

18   must be having technical issues.  29 minutes in.  We've got

19   introductions in.  Sorry for the delay.

20           And what we'll do is, we'll start first with the

21   101 motion.  As we said, we allocated 45 minutes a side.  I

22   will let you know when you have five or ten minutes left,

23   something like that.

24           We will start first with defendants' counsel.  I

25   understand that Mimecast's counsel probably is going to be

1    taking the lead, so in a second I will ask who is going to

2    speak for them.  Once we hear from them, I will turn to

3    plaintiff's counsel side for their response and go back to

4    defendants' counsel for rebuttal on the 101 issues.

5            And then once we finish that piece, we'll then

6    turn to the motion in the Barracuda case.  Again, we'll hear

7    from defendants' counsel first and plaintiff's counsel and

8    then brief rebuttal for defendants' side.  Again, we'll keep

9    time and I will try to let you know when you have a few

10   minutes left as well.

11           Okay.  So that's it.  Who is going to make the

12   primary argument for defendants with regard to the Section

13   101 issues?

14           MR. BELL:  Your Honor, Gabriel Bell of Latham &

15   Watkins.  I will be presenting principally on behalf of the

16   defendants, Mimecast in particular.

17           THE COURT:  Okay.  Mr. Bell.  I will turn to

18   take it away and I will jump in with questions.

19           MR. BELL:  Thank you, Your Honor.  And we will

20   try to share the screen, but if we have technical

21   difficulties, we will switch over just to your slides.  It

22   should be sharing right about now.

23           We are here today on the defendants' motion to

24   dismiss for patent eligible subject matter.  We have at

25   issue here two patents.  We have the '628 and the '073

1    patent.   Both of those are directed at so-called phishing

2    attempts, and those are those classic type of e-mails or

3    other types of messages you receive where somebody is

4    pretending to be somebody you trust, but is, in fact, trying

5    to trick you, trying to extract something from you, some

6    personal information, some perhaps even money.

7            And so there's no dispute in this case that

8    these two patents are materially the same for purposes of

9    Section 101.  They have the same specifications and their

10   claims mirror each other perfectly.  So we'll be focusing in

11   on the '628 patent as the parties did in their briefing.

12           And as Your Honor knows, the Alice two-step,

13   familiar two-step test governs this inquiry, and most of the

14   action in this case seems to be at Alice step one and we

15   will start there.

16           Of course, you need to look to the core of the

17   claims as the case law teaches the focus of the claims.  You

18   look at the entire claims as a whole, but try to get at what

19   is the purported advance that's being provided.  You look

20   past things like excess verbiage and technical jargon to get

21   at that core.

22           And one of the things that the Courts look for

23   is whether the core of the claims is really directed more

24   towards a human problem and providing a human solution

25   rather than a technological one, and I think Your Honor will

1    see that that is exactly what we have going on here.

2              Starting with the specification itself, it

3    described this as a very human problem.  It talks about

4    nefarious individuals, such as this nefarious Charlie in the

5    specification, who are perpetrating these phishing scams on

6    unsuspecting users, trying to trick the victims, perhaps

7    appropriately named Alice in the specification, and it talks

8    about these individuals using content that a human would

9    recognize, key words, red flags that would stand out to a

10   human.

11             And the goal, of course, of these nefarious

12   Charleys is to trick the users into interacting with them or

13   giving up some information on the pretense that this is

14   actually a legitimate message from, for example, a bank.

15   And the patent gives several examples.  I've highlighted two

16   of them here, Figure 17 and 23(b) on slide 6.

17             Figure 17 is an e-mail that we probably all

18   encountered like this in the two-plus decades that we've

19   been using e-mail, but it comes from purportedly Bank of

20   XYZ.  And so you see that and think, well, this looks like a

21   legitimate entity is sending it, but on closer examination,

22   you pretty quickly see there's something fishy going on

23   here.  You see terms like, log in immediately, or within a

24   certain time period we're going to cancel your account, this

25   sense of urgency that it's trying to instill in a human user

1    to trick them.

2              And on the right we have Figure 23(b), which is

3    perhaps an even more familiar example and goes back decades,

4    if not centuries in other contexts.  It's the classic

5    inheritance scam where somebody shows up purporting to

6    represent your long lost whatever who has just passed away

7    and wants to leave you a ton of money, and not,

8    inconsequentially, probably wants to extract a small

9    transaction fee from you to get that money in your bank

10    account right away.  We've all encountered things like this.

11              This further shows that it's a human problem

12    being addressed, and the patent goes on to say that its goal

13    is to protect humans, protecting vulnerable users from those

14    malicious Charlies, those criminal organizations like

15    Charlie.

16              And so what's the solution that the patent

17    purports to provide?  It's to mimic what humans already

18    do, and that is identify these deceptive messages that

19    appear to be from a trustworthy source, but, in fact, are

20    not, and then take action accordingly, exactly what a human

21    would do.

22              And you can see that played out in the various

23    parts of the specification.  I've highlighted for Your Honor

24    here Figure 3, which shows in very plain and simple steps

25    what you would do and a human would do the same thing.  For

1    example, receive an electronic communication.  That, of

2    course, is what we do all the time.  And then here comes the

3    guts of what ZapFraud says is somehow innovative and

4    inventive.

5         The next step is figure out how a human would

6    likely perceive it.  In other words, would a human look at

7    this as the spec says human readable content and conclude

8    that it's from an authoritative entity?  We're trying to get

9    at the likely end user interpretation.

10        Again, over and over, the specification talks

11   about it in terms of humans.  You would determine that it

12   appears to be from a trusted sender, for example, in the

13   Bank of XYZ context.

14        What do you do next?  You're probably not going

15   to take that at face value.  You're, of course, going to

16   look at the e-mail itself, for example, and determine that

17   it is, in fact, not from that trusted entity.  My bank

18   wouldn't ask me to log in on threat of cancellation.

19   Therefore, I know this is a deceptive message.

20        And what do we do with deceptive messages,

21   whether it's phishing or spam or otherwise?  Well, we

22   dispose of it.  That is a very one, two, three human-type

23   response to the human perpetrated problem.

24        And --

25        THE COURT:  Mr. Bell, just to jump in, in terms

1    of the human analogue component, you know, for step one, it

2    points in your brief, you also tried to compare this to, you

3    know, the human analogue where a human gets a letter that

4    seems suspicious, makes the same comparison, and there I was

5    thinking, well, I don't know.  I mean, you know, obviously

6    in the letter context for you, the benefit is people have

7    been getting letters for a lot longer than they've been

8    getting e-mails, but I'm thinking to myself, when is the

9    last time I looked at a letter for fraudulent identifiers in

10    the same way that one would look at e-mail now?  You know,

11    it seems like a particularly e-mail kind of problem, at

12    least in recent vintage.

13              Is the better human analogy in your mind not a

14    human getting a letter and comparing its contents to what it

15    might expect, but a human getting an e-mail and manually

16    doing the kind of review that the claim says it does to try

17    to determine if there's fraud?

18              MR. BELL:  Yes, Your Honor.  We think either

19    analogy is good, but what separates this part aside from one

20    of the others where you had to stretch a little more to make

21    that type of analogy, here we need no analogy whatsoever.

22    We would submit that the specification contemplates that

23    humans can do precisely what ZapFraud says is so innovative

24    even in this e-mail context.

25              And I would point Your Honor to column 8,

1    lines 11 through 20, and then further down in that column,

2    which I've highlighted for the Court.  Here, it expressly

3    says that human reviewers can be used instead of automated

4    analysis.  For example, it says, you can use a human

5    reviewer to determine whether the communication appears to

6    have been sent on behalf of that authoritative entity.

7                 And you can further, and this is important on

8    down the column there, the human review can actually decide

9    the entire disposition of the message.  In other words, what

10   you ultimately do with it from start to finish can be

11   outsourced to a human.  And there was a good reason for

12   this.  The specification at various points talks about how

13   the computer might not be able to do this, and that makes

14   sense because mimicking human thought is a difficult issue,

15   but the claims here and the specifications don't really

16   attempt any technological solution to that.  In fact, they

17   admit the opposite, that human review of e-mail, even in the

18   e-mail context, can be done, and therefore that shows us

19   this is abstract.

20                 THE COURT:  So claim 14, for example, you think

21   there's no dispute, it can be performed by a human.  This is

22   not one of those 101-type motions where the claims make it

23   clear that it can only be performed electronically, but

24   we're still making the human analogue comparison?  You think

25   it's different here?

1          MR. BELL:  We think it is absolutely different

2    here, Your Honor.  Based on the claim language itself, which

3    I've brought up for the Court, if you go down step by step,

4    putting aside generic computer implementation, automation,

5    for example, in Symantec, where there was another system

6    that purported to improve e-mail evaluation and dispersal to

7    different entities to avoid malicious content, here we

8    likewise have the basic steps of receiving the message.  A

9    human can do that.  Parsing it out, meaning identify what is

10   the name of the sender on the e-mail.  We all do that.  And

11   then we get to this big block of text.  And this is talking

12   about computing a similarity distance between that name

13   that's on the e-mail and a name that you know to be a

14   trusted entity.

15          And it all boils down to saying, those two

16   things are very similar.  In fact, the claim provides, you

17   can determine simply that they're the same.  So to take our

18   Bank of XYZ example, I see that the e-mail is from Bank of

19   XYZ on the sender field, and in my head I know, ah, I bank

20   at Bank XYZ.  Those two things are the same.  Therefore, it

21   purports to be from an authoritative entity.  That's all

22   that that text requires.

23          And here is the key part, too.  When you look at

24   the next step, in the next step you would think, this is the

25   hard stuff, determining that this purportedly trusted e-mail

1    is, in fact, deceptive, and when that comes up, the claim

2    provides nothing.

3              We see at the top of the second column the

4    entire step of determining that this is, in fact, not from

5    this trusted entity.  It is recited completely end results,

6    functional based.

7              How do you do that according to the claim

8    language?  It doesn't say, for good reason.  That's hard.

9    And a human does it innately.  Immediately you see that

10   insurance scam or inheritance scam, and you know right away

11   if you look closely enough at it that it's deceptive.  The

12   claims don't tell you how to do it.

13             And then, finally, you have this block of text.

14   That boils down to determine that this thing is bad and

15   throw it away.  There are other options provided, to be

16   sure, but the other options are stick it in a spam folder,

17   send it to some reviewing person in your IT department, for

18   example, who might look it over further, flag it in some

19   other way, but one of the options is erasing it, and I don't

20   think there's any dispute that that is something humans can

21   do.

22             And to your Honor's question, ZapFraud itself in

23   its description, its description of the purported advance,

24   and I've taken the excerpts here from pages 6 and 7 of their

25   opposition, right down the line you'll see that their first,

1    second and third parallel what a human would do, and we can

2    go through it.  Determine whether an incoming communication

3    would appear to be trustworthy to a user.  Again, mimic how

4    a user receiving this would interpret it.

5           Second, determine that it's, in fact, not from

6    that purported trusted sender.

7           And, third, in ZapFraud's words, it's bad and

8    dispose of it.  That is a very human process directed at a

9    very human problem and therefore puts it squarely in line

10   with other cases as I noted in Symantec.

11          In Symantec there were automated steps that

12   sought to get at a similar problem, the unwanted receipt of

13   spam, viruses, other things by the recipient in an

14   organization.

15          And what this patent did is it said conventional

16   systems operated on a certain protocol of distributing

17   e-mails.  We're going to change that to another protocol.

18   And the Federal Circuit though said, and this was a case

19   arising outset of this district, where this district found

20   it ineligible and the Federal Circuit affirmed that despite

21   the computer implementation, it's really just human

22   practical concepts with an analogy to a corporate mailroom.

23   And, again, we submit it's even stronger here where you

24   don't need any sort of analogy to perform the claim

25   language, which we just have done here today.

1            And the case says, with the exception of generic

2   computer implemented steps, there is nothing in the claims

3   that would prevent a human from doing it mentally or with

4   pen and paper, and we see this in other examples of computer

5   systems purporting to detect and deter fraud that prior

6   systems could not detect and deter.  We see that in the Fair

7   Warning case presentation, we see that in the Bozeman case,

8   and we see that in a host of other cases where software is

9   being used to, for example, control unauthorized access to

10  computers in Ericsson, to detect and deter credit card fraud

11  in CyberSource, and so on.  There's a host of those.

12            So what ZapFraud seems to really be arguing is

13  that as a whole, conventional systems did not perform these

14  type of analyses, but in Symantec and those other cases,

15  they refuted that that be, that that is the test.  It said,

16  it's not whether conventional computers already apply the

17  concepts, and that is important because where as here and as

18  in those cases, the purported advance is itself an abstract

19  human performable concept, it doesn't matter whether it was

20  ever computer implemented before.  And this I find

21  noteworthy.

22            We've provided for the Court the specification

23  in the Symantec '142 patent, which is rife with statements

24  about how it improves on existing e-mail protocols.

25  It denigrates conventional systems.  It says, we do it

better, we overcome the deficiency of conventional systems,
and that simply wasn't enough there, just like it's not
enough here.

And we can step through the same thing as found
in the Fair Warning patent specification, in the Bozeman
patent specification, and so on.

And so when we get down to specifics, ZapFraud,
as I could make out, relies principally on two things to
make it non-abstract.  The first is the similarity distance
computation and the second is this support vector machine
option, and we'll step through each of those in turn.

We've already kind of touched on this and I
won't belabor it, but the similarity distance calculation
just means determine that these things are similar, these
things being the name on the e-mail and some entity that I
know to be authoritative.  And so that's all that that is.
A mental process that humans can do automating it on a
computer doesn't make it non-abstract.

And then, second, the support vector machine
doesn't help ZapFraud in this case for at least three
reasons.

First, it's an optional technique to assess
similarity.  It's one of those six options put in that block
of text that says, use any of these, and one of those other
options is just determine it's the same, like a human would

1    do.   Support vector machine is one of the other options that

2    doesn't limit the scope of the claims.  We know that from

3    other invalidity contexts such as anticipation in the In re

4    Johnston case.  They can always be omitted, and therefore,

5    by definition, are excess verbiage, we would submit, in the

6    language of the Alice test.

7          But a second reason is that the specification

8    itself treats support vector machine as what it is, a

9    conventional machine learning technique that is not

10   purported to be inventive or approved.  It's just used as

11   another option for the domain similarity.

12         And for those things that no technical details

13   are provided in the spec, the spec itself says that

14   those are known in the technical fields and so aren't

15   described so as not to obscure the purported invention.

16   This further confirms that the support vector machine is

17   not part of the purported invention.  It's just instead a

18   conventional recognition technique such as those at the

19   Federal Circuit in Content Extraction doesn't change the

20   abstraction analysis.  In that case, it was optical

21   character recognition technology.  There happens to be one

22   of those dependent claims here, too.  But the point is

23   tacking that on didn't somehow take it out of the realm of

24   abstraction.  It was just one of the many options that you

25   could do.

1          And, finally, even if a support vector machine

2     were somehow groundbreaking and new and brilliant, it's not,

3     but the case law is also clear that it's still abstract

4     because it's a calculation.

5          If you look at the SAP case, there were several

6     very specific technical ways of calculating statistics that

7     were provided in one of the dependent claims, the bootstrap

8     and jackknife method, and the Federal Circuit said, we can

9     assume that any techniques you're adding here are

10    groundbreaking and that doesn't help because those are

11    ultimately mathematical constructs.  The same we submit is

12    true here.

13         So when it comes to case law, we submit that

14    this falls squarely within the Symantec line of cases and

15    not within the Finjan line of cases.  ZapFraud relies

16    principally on Finjan.  That's the only one it gives any

17    meaningful description of, and so we'll focus on that as

18    well.

19         The claim here is different for two fundamental

20    reasons.  First, in that case it was a computer problem that

21    was being addressed.  It was attempting to protect computers

22    from malicious computer code, those ones and zeros that are

23    down at the machine level that only a machine can

24    understand, and so for that reason, there was no suggestion

25    in that case that humans could perform anything remotely

like that.  They couldn't read a sheets of ones and zeros or
machine code and know that this was going to be a malicious
type of activity.  Instead, there were specific steps for
generating a security profile that had the functional
ability, the software had the functionality ability to
identify suspicious code, link it to a downloadable, and
thereby prevent these computer attacks.

In contrast, the case here falls into another
category, one whereby the specification's own admission,
we're trying to protect humans from those malicious other
humans, Charlie.  And, again, the specification admits that
humans can perform, which we submit makes this somewhat
unusual to be that candid in the specification, that humans
can really just sub in for all of the meat of the analysis,
and that confirms that it is, in fact, abstract.

To briefly touch on the other cases that
ZapFraud mentions, we think it falls outside of those for
the same reasons whereas Enfish had an improved
self-referential database that changed how the computer
operated, different operation of the field within a
database.  Here, in sharp contrast, we have at most a
generic database with an empty cylinder depicted, and you
can use any profile or content database, no improved
structure there.

Similarly, with Core Wireless, their improved

1    functional interface was functional to allow the users to do

2    things they couldn't otherwise do whereas here it's generic

3    interface.  And likewise with SRI and Uniloc that improved

4    computer network technology or the communication itself,

5    here the specification is clear, you can use standard

6    commercially available server hardware and typical server

7    class operations systems.

8              And to go from the specifics to the general, the

9    ZapFraud patents make clear that you can use general

10   components.  Again, standard and typical hardware and

11   software, and no particular details other than those that

12   are claimed.

13             So for all of those reasons -- yes, Your Honor?

14             THE COURT:  I was going to say, Mr. Bell, before

15   you get to step two, I didn't want to stop your train there,

16   but I have some questions.  Is it a good time to ask them

17   now?

18             MR. BELL:  Certainly.  Absolutely.

19             THE COURT:  Okay.  So to be more precise in

20   looking at the limitations in the claim, my guess is you

21   would say the receiving and the parsing steps of the claim

22   have to be done by a computer, but your point is that maybe

23   everything after that, particularly the determining step

24   based on what the patent says and what the language of the

25   claim is, that can be accomplished either by a human or by

1    computer technology?

2              MR. BELL:  At least on its face as claimed the

3    receiving is done by one server.  So there's no contention

4    that a human is a server per se.  We think certainly

5    analogous, but, again, staying on the text of the language,

6    yes, that's necessary, attendant, wind-up steps for what

7    ZapFraud said is the invention.

8              THE COURT:  Okay.  So maybe receiving and

9    parsing, since they have to be done by at least one server,

10   those have to be kind of computer-based steps, but

11   determining, and then the remainder of the work that is

12   done, you would say it seems to you like that stuff, you

13   could infringe this claim if a human or a computer did those

14   steps.  Is that right?

15             MR. BELL:  Certainly, if you put aside the

16   notion that a computer must perform all of the steps, then,

17   yes, a human can do exactly those type of steps laid out.

18             THE COURT:  Okay.  And I am just wondering how

19   if a server is doing steps one and two based on the way the

20   claim is written, can a human do the rest of it?

21             MR. BELL:  Well, again, that's why I caveat it

22   with saying, for example, it says, by determining at least

23   one classifier component.  So if that classifier component,

24   you say that has to be a computer and maybe in this context,

25   let's assume that it does.  The point is that a human can

1    do, putting aside labels, a human can do all of the guts of

2    it.

3              THE COURT:  Okay.

4              MR. BELL:  Yes.

5              THE COURT:  So tell me if this is right.  You

6    wouldn't dispute, at least for purposes of, you know, at

7    this pleading stage, that maybe these claims have to be, if

8    the other side tells me they do, have to be performed, or I

9    should understand that the words used in the claims to mean

10   that they have to be performed by a computer, that is all of

11   the steps.

12             Your point is that based on the content of the

13   patent and the nature of the steps, even if, as a technical

14   matter, the claim has to be performed by electronic

15   technology, a human could do all or nearly all of it?

16             MR. BELL:  Precisely, Your Honor, and I would

17   point back to the Symantec case, where there were

18   undisputedly computer elements at every step.  There

19   was a receipt mechanism, a rule engine, a distribution

20   engine that were computerized, but the Federal Circuit said,

21   putting aside those generic labels and components, a human

22   can do everything else, and that's what we're saying here as

23   well.

24             THE COURT:  Okay.  Again, with regard to the

25   analogue, there is record evidence, including some of the

1    material submitted to the PTO and the Examiner that it is

2    difficult for a human to do the type of comparison with the

3    same kind of accuracy as a computer might do it.

4              I know that it's the case that if the computer's

5    function is simply to speed up the process at issue, that is

6    not sufficient for plaintiffs to get over the 101 hump.  You

7    cited some case law in a footnote in your reply brief that

8    if the computer's function is to make things more accurate,

9    not just faster, but more accurate, that, too, isn't enough

10   to have the requisite add that you need to get over a 101

11   hump if you are a plaintiff.

12             Is that the state of the law, that adding

13   accuracy -- you know, humans can't do this as accurately

14   in their own minds.  Does that not matter for purposes of

15   101?

16             MR. BELL:  It does not, Your Honor, and I would

17   return quickly to column 8, to point out that the

18   specification itself admits that humans can be active

19   enough.  Basically, if you focus enough on it, you're going

20   to be able to detect it.  And so I would take issue with the

21   premise of it a little bit and say that the specification

22   admits they can be.

23             I know ZapFraud says that they can't be.  They

24   don't really dispute that humans can do this kind of thing,

25   but as Your Honor, as they say, they aren't accurate enough.

1    But, again, I believe column 8 refutes that, and further

2    down in column 8, it even says that contrary to ZapFraud's

3    notion that a trained reviewer can't do it, it even says

4    that trained reviewers can do it.  That trained reviewers,

5    including paid employees of the operator, including a

6    third-party outsourcing platform, including a member of the

7    IT department can do it.

8             So I think humans can do it, but even if

9    computers could do it a little bit more accurately or even a

10   lot more accurately, the state of the law is, and this is, I

11   would submit, the fundamental basis of Alice itself.  When

12   what you are doing is saying, do this stuff on a computer,

13   admittedly, let's say all the limitations are computerized,

14   Alice and its progeny say, merely doing that, which, of

15   course, is going to go faster and potentially more accurate

16   than a human, isn't enough when the steps, the way you're

17   saying to do it, is effectively the same.

18             I've posted a quote here from the OIP case.  In

19   that case it was about determining pricing schemes and what

20   an end user customer would likely respond to in terms of the

21   optimal price, and so the computerized system by OIP came

22   along and said, ah, we can predict it better.  We're going

23   to do this prediction on a computer more accurately.

24             And the Federal Circuit recognized that unless

25   you are going to give us some real details about the

1    technology required, the improvement in the computer

2    functioning, it's not enough to just say, kind of wave your

3    hands and say, well, we'll make it more accurate, and that

4    is still the law today.

5            THE COURT:  No, and I understand that there is

6    evidence in the patent that humans can attempt to do this.

7    In terms of whether there's a fact dispute about whether

8    they can do it as accurately, you know, for example, the

9    plaintiffs point to page 183 in Exhibit A of your opening

10   brief as a statement from the patentee that suggests that

11   humans in some ways aren't proven to be very bad at making

12   some of the detections that the patent attempts to try to

13   make electronically.

14           Again, I think your point is even if there is a

15   fact dispute, the accuracy add per cases like OIP doesn't

16   matter from the perspective of trying to save the claims at

17   101.  Is that right?

18           MR. BELL:  That's exactly right, Your Honor.

19           THE COURT:  Okay.  And then with regard to what

20   the patent tells us about why it is that the claimed

21   invention was a step forward, it sounds like you wouldn't

22   dispute that there is material in this patent which there

23   sometimes isn't in these 101 cases, where the patentee does

24   clearly say that the type of comparison that's being done

25   here is alleged to be new.  It was not done previously,

1 according to the patentee.  It talks about the prior art

2 solution of looking for particular words that are to be

3 flagged.  It talks about how people can get around that by

4 using variations of just those words, and then goes on I

5 think to say pretty clearly, so I'm about to tell you about

6 a new way that we've invented that helps remedy what is not

7 good about the prior art.

8    And also I think the patentee tells the Examiner

9 in Exhibit A about some other prior art solutions, like

10 putting e-mails on a whitelist, that sometimes will block

11 e-mails that you actually want to get.

12    So it sounds like there's a fact dispute about

13 whether this is a new way of comparing e-mails to try to

14 figure out there's fraud, but your point, I gather, is, even

15 if there's a fact dispute about whether it's new, we think

16 that the asserted add is itself actually an abstract idea

17 because it's too analogous to what a human can do and does

18 do, is that right, and so it doesn't count for purposes of

19 101?

20    MR. BELL:  That's exactly right, Your Honor, and

21 that's borne out in the case law that explains how novelty

22 and nonobviousness are not the test.

23    In Symantec, for example, it's notable I think

24 that the jury found the claim, the e-mail system that

25 improved on prior e-mail systems were, in fact, novel and

1    nonobviousness or at least rejected invalidity.  But the

2    Federal Circuit and this court said that doesn't matter.

3    It's not relevant to the 101 analysis.  Why?  Because the

4    purported invention, as Your Honor just indicated, is itself

5    an abstract idea.

6            And similar in ECT, and there's a host of other

7    cases going back to the Supreme Court's decision in Fluke,

8    where in Fluke, it was an improved way of calculating alarm

9    values.  For example, in a petrochemical field.  Very

10   technical, very specific.

11           And the Supreme Court said, let's assume it's

12   new.  Let's assume it's new.  That purported advance is just

13   math and therefore abstract and ineligible.  So, yes, the

14   answer to your question is yes.

15           THE COURT:  Okay.  Then I wanted to ask,

16   obviously, the Examiner at a certain point, although it had

17   raised 101 concerns a number of times previously, the

18   Examiner ultimately was persuaded that the additions of the

19   how in the first determining step were enough to get the

20   claims over the hump for 101 purposes.  An Examiner's view,

21   for whatever reason, the Examiner felt they were not

22   ineligible.

23           Two questions about that.  One is, it doesn't

24   seem like it, as far as I can tell, that the Examiner ever

25   articulated why it is he or she felt that that was the case,

1    and then, secondly, assuming that the Examiner didn't, why

2    isn't the fact that the Examiner looked at this very, these

3    additions to the claim that are now at issue and made a

4    determination that the claims could survive, why isn't there

5    something about that reality that suggests that at the

6    pleading stage, that the plaintiff might not get the benefit

7    of the doubt?

8                MR. BELL:  So a couple of responses.  To answer

9    your Honor's question, the Examiner does not explain why and

10   expressly said, I'm not going to explain why.  This is at

11   pages -- Exhibit A, 200 and 201.

12               What the Examiner says is, the claims have been

13   amended to add additional elements which amount to, in the

14   Examiner's view, significantly more than the alleged

15   abstract idea, and those elements, as Your Honor noted, are

16   those six optional ways to calculate similarity.  So they

17   don't give a particular explanation.

18               And to answer Your Honor's second question, it

19   doesn't matter for a host of reasons.  One, Examiners often

20   examine and, you know, make their best determination about

21   what is and isn't eligible, but it's also the Courts that

22   decide.

23               And so on the pleadings, I would point the Court

24   to the SAP case, which was decided on the pleadings, and

25   reiterated this principle, what's shown on your screen here,

1    quoted, that even if it's brilliant, groundbreaking and

2    innovative, that's not enough.  And what's notable here is

3    the Federal Circuit itself in a prior recitation of the SAP

4    appeal had found that it would be novel and nonobvious.  And

5    then when it came back up, the Court nonetheless said, we

6    put that aside.

7              So if there is an authoritative entity that can

8    speak on novel and nonobviousness, certainly, more so the

9    Federal Circuit itself than an Examiner, and even there, it

10   didn't decide it on the pleadings.  To the contrary, it

11   affirmed the pleading stage ineligibility precisely because

12   as here, the purported advance itself abstract.

13             THE COURT:  Okay.  And then I guess as we turn

14   to step two, maybe a couple questions in advance to kind of

15   anticipate where you are going.

16             Would you acknowledge that, you know, the way

17   that the method makes the comparison in the first

18   determining step, by comparing the display names and the

19   headers of the e-mail with those that are known to be from

20   the authoritative entity, that that detail, that extra how

21   isn't necessarily captured in your broader articulation of

22   the abstract idea.  In other words, that's the stuff that we

23   need to look at to figure out does it amount to an inventive

24   concept.  I know you're going to say it does not, but at

25   least that is the extra step that is not necessarily

1     captured in the broader abstract idea.

2              Is that fair?

3              MR. BELL:   I think I would take a little bit of

4     a different spin on it, so no in part would be my answer.   I

5     think included in the abstract idea, the vast majority of

6     that text, computing a similarity distance, determining by

7     comparing and matching certain things and determining that

8     they're the same, those are all part of the abstract idea

9     because that's what a human would do anyway.

10             So although expressed kind of verbosely, it

11    boils down to, I look at the display name, I match it in

12    my head to a known entity and determine that they are the

13    same.

14             Now, certainly, there are other options provided

15    in determining that those are the same, and those include

16    things like a Hamming distance, the vector analysis and so

17    forth.   And for the reasons I discussed with respect to the

18    vector, the same would apply to those other optional things.

19    They can't limit the scope of the claim, and so in a sense,

20    yes, they are in addition to the abstract idea, but in a

21    sense, they don't really even matter at all precisely

22    because they're optional.   In any event, nobody has said

23    they're unconventional and, in any event, they're

24    mathematical.

25             THE COURT:   Okay.   And so for you, the piece

1    that, you know, might fairly be said to be the alleged

2    inventive concept, which you say is not one ultimately, is

3    the way in which, the alternative ways in which the matches

4    are determined, starting out with the, kind of the last full

5    paragraph of claim 14 that's on the left-hand side of the

6    slide you have up.  Is that right?

7                MR. BELL:  To some degree, yes.  I think we're

8    guided here by what ZapFraud says are the inventive

9    features.

10                So with Your Honor's permission, I will go to

11    that slide and point out that they identify, as best I can

12    tell, two purportedly specific and concrete steps, and these

13    relate to Your Honor's question, the second of which is the

14    similarity distance, which would include those various

15    optional ways of doing it, and the first is the database.

16    And as Your Honor knows, we don't think either of those are

17    inventive.

18                THE COURT:  Okay.  So maybe both the utilization

19    of a database to save certain of the information that's

20    going to be compared and some aspect of the matching process

21    are maybe the things that are asserted to be the, you know,

22    broader, or more specific than the broad inventive -- the

23    broad articulation of the abstract idea and the things we

24    have to focus on for step two purposes?

25                MR. BELL:  Correct.  Correct.

1              THE COURT:  Okay.

2              MR. BELL:  Yes.

3              THE COURT:  And then just again, before we go to

4    step two, on the matching piece, I think this is your

5    argument, tell me if this is right.  That when you have a

6    claim that adds alternatives like that piece does, what you

7    basically have to do to determine whether it is helpful or

8    hurtful in the 101 context is ask, in essence, almost like,

9    what is the least common denominator?  What is the broadest

10   articulation of how you can do the matching?

11             And I think there, you're saying, well, that's

12   the first option.  It's determining that the compared items

13   are the same.  And if the question is, well, why, because I

14   think the plaintiff fights that in the briefing, that you

15   are wrong to say that since these are like six different

16   options, what you really have to do is simply look at the

17   first one.

18             Is the reason why you're saying that that is the

19   way it works in 101 law is because the law is about, is

20   worried about preemption, and that if one of the options, if

21   you can infringe by way of the broadest option, then it's

22   that option that is the most worrisome from a preemption

23   perspective, and that that is why you look, in essence, only

24   at that broadest option as opposed to maybe narrower

25   asserted options like a Hamming distance or the use of a

1    support vector machine?

2                    MR. BELL:  That's correct, Your Honor, because

3    it's a basic principle.  It's optional.  It can be omitted.

4    Therefore, the breadth will be determined by the broadest

5    one.

6                    THE COURT:  Okay.  Let me move on to step two.

7                    MR. BELL:  Okay.  Thank you, Your Honor.  We've

8    already touched on some of it.  I would like to reiterate

9    that when it comes to step two, the key step here that I

10   think is the hard stuff that a human would do naturally,

11   decide that this thing is deceptive.  Putting aside all of

12   that other stuff of looking at whether it's from an

13   authoritative entity, which we would submit a human does

14   that naturally, including sub-options, but getting to this,

15   this is what's telling, I think.  That all the claim

16   language says is, do it.  Determine if it was not

17   transmitted with authorization.

18                   Now, how do you do it?  It doesn't say.  What do

19   you rely on?  It doesn't say.  Well, humans do that, of

20   course, and likewise, it doesn't tell you how to determine

21   the message is bad.  It just says, do it.  So that's another

22   key hallmark of claims that fell under Section 101.

23                   So what ZapFraud really boils down arguing, we

24   submit, is that the claims as a whole are unconventional.

25   They do something that prior e-mail systems don't do, but

1    for the reasons we've discussed, that doesn't work because

2    the purported advance here is itself an abstract itself.

3            The test the Federal Circuit has said is not

4    whether the entire claim as a whole was well understood in

5    achieving conventional.  Rather, whether apart from the

6    abstract idea, there's anything like that.  And here, there

7    is nothing like that, and therefore that attempt at a fact

8    issue doesn't matter.

9            We can assume that no system did this precise

10   series of steps in the past and it makes no difference

11   whatsoever because the claimed advance is itself, by

12   ZapFraud's own telling, I think, if you look at, again, what

13   their three steps are, those three steps are all performable

14   by humans and therefore abstract at step one and can't add

15   anything eligible at step two.

16           I know I'm getting close on time here, so very

17   briefly, dependent claims 4 and 5.  There's really no

18   dispute that claim 14 of the '628 patent is representative

19   of all claims with the exception perhaps of these two

20   claims.  These are the only two they call out and the only

21   two they distinguish, but, again, if you look at these, what

22   it is saying is to do something a human would do, evaluate

23   the text present in the body portion of the e-mail.  Of

24   course, we do that.

25           And then claim 4 says use a collection of terms,

1   meaning look at it holistically.  You don't just look at the

2   sender, you don't just look at one term.  You look at the

3   collection of terms, and there's no how given here either.

4   And with claim 5, performing an equivalence analysis, again,

5   how do you do that?  The claim doesn't say.

6        So we can look to the specification for some

7   details here.  Again, here's this collection of terms that

8   the patent says is the problem.  You want to know that if

9   you see those underlying things, there's something fishy

10  going on, but a human administrator, the patent admits, at

11  column 31, can create that collection of terms.  In other

12  words, again, it's ultimately a human doing the hard stuff

13  and saying this is what's going to indicate something that

14  you need to watch out for.

15       And how do you do the equivalence analysis?

16  It's just terms that fulfill the same purpose if used in the

17  story.  In other words, don't be fooled if they say we have

18  a million dollars for you instead of a huge sum of money.

19       Again, this is intuitive, unconscious, innate

20  stuff that humans would do, and the whole point of this

21  is trying to get a computer to do it as well or better

22  than a human using the same basic concepts that a human

23  would do.

24       And so when we come to the question of whether

25  to do it now or have the parties litigate further and try to

1    drum up some sort of factual issue, we would submit that

2    there's no reason to delay.

3              THE COURT:  You're at about five minutes left.

4    I will make sure you save at least five minutes for

5    rebuttal.  I have a question I want to ask before you end,

6    but just to let you know, you have justify a few minutes

7    left.  Okay?

8              MR. BELL:  Thank you.  With that, I can

9    essentially wrap up.

10             There's no claim construction dispute here.  The

11   only fact dispute that they provide is whether the claims as

12   a whole are unconventional, which doesn't matter.

13             And, third, there's nothing in the complaint

14   itself that will change that.  This is now their second

15   amended complaint.  They saw our full 101 briefing after the

16   first amended complaint and didn't add anything to bolster

17   it.  Instead, just confirmed that it's really a human

18   problem and restate the abstract idea.

19             And with that, I will reserve any time I have

20   left and answer Your Honor's question.  Thank you.

21             THE COURT:  Okay.  Thanks, Mr. Bell.  And as I

22   said, I will give you five minutes or rebuttal.

23             I had one last question that won't count against

24   your time, and that's just sometimes it's difficult at step

25   two to figure out whether the asserted inventive concept

1    really amounts to the kind of specific improvement in

2    computer technology or functionality that the Federal

3    Circuit was talking about, you know, in cases like Enfish or

4    in Finjan or the like, or whether it doesn't amount to that.

5    And I know here you say the asserted inventive concepts

6    don't, and the reason why they don't is because, in essence,

7    they amount to an abstract idea themselves.  They're the

8    kind of things that humans can do.

9              Is there any other way or test when you think

10   about what it is, how do you know when you see, you know,

11   additions to claims that actually really do amount to, you

12   know, whatever the bar is for specific improvements in

13   computer technology?

14             Is there a shorthand that you think is helpful

15   when you look at claims and you would say, and, Judge, if

16   you use that shorthand, which the Federal Circuit is using,

17   you'll see that the claims here in the asserted relevant

18   adds here just don't match up to it?

19             MR. BELL:  I don't think there's a good

20   shorthand for saying what's inventive.  The courts usually

21   say what isn't inventive and they do that often by comparing

22   it to other claims that are found potentially inventive or

23   inventive.

24             I think it's noteworthy here that the Federal

25   Circuit typically resolves all of these at step one of

1    Alice, so the cases you just mentioned, Your Honor, Enfish

2    and Finjan, were decided as a matter of law at step one, and

3    I think that's why ZapFraud really pushes all of its chips

4    in at step one.

5              At step 2 at page 20 of their opposition, they

6    hardly give it any analysis.  I think they realize that the

7    game here is really at step one, and therefore as a matter

8    of law when it comes to step two, a handful of cases in the

9    Federal Circuit, Atrix, Cellspin Soft and a number of

10   others, did find a fact issue, but in those cases, they were

11   extenuating circumstances that made it different, including

12   Your Honor's decision in the Trust ID case from last year,

13   where you were uncomfortable granting on the pleadings

14   because there were claim construction disputes and there was

15   no suggestion there that humans could actually do what was

16   done here.

17             So to return to Your Honor's question, one of

18   the shorthands might be it doesn't include things that

19   humans could do.  It doesn't include things like math.  It

20   doesn't even include adding two things together, putting

21   something additional in that is itself abstract on top of

22   the other abstraction.

23             In the SAP case, there was an underlying

24   abstract idea, and the Court said, you can't make that

25   non-abstract by putting some more math or abstract or human

1    performable stuff on top of it.

2            And so for all of those reasons, we think it's

3    entirely appropriate and warranted to grant defendants'

4    motion to dismiss at this time.

5            Thank you, Your Honor.

6            THE COURT:  All right.  Thank you, Mr. Bell.

7            Let me turn to plaintiff's side.  And who is

8    going to speak on behalf of the plaintiffs?

9            MR. McDAVIT:  Your Honor, this is Jonas McDavit

10   for ZapFraud.

11           THE COURT:  All right, Mr. McDavit.  I will turn

12   it over to you to get started when you are ready and again,

13   I will jump in with questions.

14           MR. LOGAN:  Your Honor -- I'm sorry, Your Honor.

15   This is William Logan for Proofpoint.

16           We wanted to speak as well.  Would you prefer us

17   to go after plaintiffs have gone just to add briefly to what

18   Mimecast had said?

19           THE COURT:  I'm sorry.  I didn't realize that

20   multiple defendants were going to be making argument on this

21   issue, but I apologize.

22           Yes.  I guess, you know, the defendants in

23   total are close to the end of their time, so I will ask,

24   perhaps, this should be brief, before we hear from

25   plaintiff's side.

1          MR. LOGAN:  Yes, Your Honor.  I will be brief.

2     Again, this is William Logan.  I'm an associate with Winston

3     & Strawn.  I'm arguing under Your Honor's inexperienced

4     attorney orders, so I just want to start out by thanking the

5     Court for that order, and I appreciate the opportunity to be

6     able to speak today.

7          THE COURT:  Okay.  In light of that, too,

8     Mr. Logan, then I will add at least some minutes.  I know we

9     got close to the defendants' time here, but I will add at

10    least five minutes of time for you to be able to make

11    arguments that you want to make.

12         MR. LOGAN:  Thank you, Your Honor.  I appreciate

13    that.  And I don't want to re-cover the territory obviously

14    that Mimecast has already covered because they did an

15    excellent job going through it the first time.  What I would

16    like to do, Your Honor, is just address a couple of

17    questions that the Court had and see if we can add anything

18    of value there.

19         You know, to begin with, the Court asked at one

20    point is letters a good analogy, and what Proofpoint would

21    submit is, while letters may not be necessarily the business

22    compromise type of e-mails that we've been discussing here,

23    one analogy to look at with letters that the Court may be

24    familiar with are deceptive marketing letters, letters that

25    come in and appear to be, for instance, from a credit card

1    processing company, but when opened are actually just an

2    advertisement for a new credit card.

3            So that same sort of mental process that we

4    are talking about at a high level of seeing a message,

5    seeing a letter, thinking maybe it's one thing based on

6    what you see on the envelope, but then looking closer,

7    determining it's not what you thought it was and throwing

8    it away is a very human process, and it's something we do

9    in other contexts.

10           For instance, Your Honor, you know, one that's

11   probably very familiar to everyone are the unwanted phone

12   calls with marketing messages, that you answer the phone

13   call, it says it's from the claim processor center from a

14   credit card company.  You determine it's not and you hang

15   up, effectively discarding the communication.

16           So these are all very human processes, the ways

17   of looking at messages and determining whether they are

18   trustworthy or not, you know, at a high level.

19           In this instance, the Court asked specifically

20   about whether the optional components mattered, and this is

21   something, Your Honor, that Proofpoint believes is very

22   important to this, and it's on pages, I won't display the

23   slides, but pages 6 through 8 of Proofpoint's slides in this

24   case have the relevant claim language there.  And

25   essentially, it comes down to two things.  It's computing a

1    similarity distance, and this really segues in Alice, where

2    it talks about how a skilled drafter can sort of help draft

3    around the abstract idea, maybe try to obfuscate it a little

4    bit.

5            Here it talks about being a similarity

6    difference.  There's lots of verbiage, but then it gets to

7    by at least one of, and the by at least one of just requires

8    as one option a match between the display names, which again

9    is a very human process to look at two names and see whether

10   or not they match.

11           Now, Your Honor had a question of, is it enough

12   if, you know, a computer can do this more accurately than a

13   human?  And Mimecast addressed that question well, but

14   Proofpoint would add, Your Honor, that there's nothing to

15   indicate that at this basic step looking at two display

16   names that a computer is any more accurate than a human of

17   telling whether two display names are the same or not.

18           So --

19           THE COURT:  Is there anything in the -- I guess,

20   you know, maybe, Mr. Logan, do you want to restate that

21   point again?

22           MR. LOGAN:  Yes, Your Honor.  And, again, I'm at

23   the comparing similarity distance step now where it's

24   looking for that match between two display names, the

25   display name on the e-mail and the display name of an

1    authoritative entity.

2              Now, there is that other language about headers,

3    but keeping in mind, Your Honor, the claim only requires at

4    least one of those two options.

5              So at a basic level, what Your Honor kind of

6    brought up was the broadest, which is look at these two

7    names and see if they match.  So at this level, we're at a

8    very human process that a human can do accurately, look at

9    the two names and see if they're the same.

10              Then we --

11              THE COURT:  Is that the case -- again, we do

12    have some -- I mean, obviously, you know, humans are human,

13    and so, you know, people's eyes can trick them, people's --

14    you know, human being are fallible.  Computers obviously

15    can -- I think it's probably more hard to deny that they can

16    be more accurate, and we do have some information in the

17    record even from the patentee suggesting that, look,

18    computers are more accurate in humans in terms of at least

19    some of the kind of matching that's required in this

20    comparison.

21              I know your point is at the highest level, if

22    you are comparing if it's the same, that's pretty easy.  But

23    even there, I mean, there could be, couldn't there, some

24    factual disagreement about whether humans are as accurate as

25    computers?  Isn't the broader point in the defendants' view

1    that even if so, they don't think that accuracy distinction

2    makes a difference?

3              MR. LOGAN:  Your Honor, I think that's correct.

4    I don't believe the accuracy decision makes a difference,

5    and that definitely is a point that Mimecast covered very

6    well there, but I think it is worth noting, because as Your

7    Honor mentioned, and this is more at the next step, but

8    there's all these different options for how the match can

9    take place.  And this again goes back to, you know, how a

10   drafter can draft essentially around the abstract idea to

11   add other language, superfluous options, very much like a

12   Markush claim in a lot of ways, where you have a range of

13   options you can choose from.  And the very first one, Your

14   Honor, is just determining that the compared items are the

15   same.

16             And, again, while I take Your Honor's point

17   that, you know, a computer may have certain advantages as

18   far as being able to process things more efficiently,

19   process things more quickly, at a basic level, when it comes

20   down to looking at two names and seeing whether those two

21   names are the same, a human can do that just as well, and,

22   in fact, in some instances, maybe better, particularly when

23   it comes down to if there may be an inadvertent error in the

24   name.

25             A human is more likely --

1                    THE COURT:  But, Mr. Logan, the point would be

2        at the pleading stage, citing to what?  You know, for that

3        claim, aren't you citing to William Logan?  I mean, don't I

4        have to look at the record, and if there's even a hint in

5        the record of a factual dispute about an issue, are

6        arguments just as good at computers at determining whether

7        the display name of, for example, a bank matches what the

8        bank's name should be?  Do they do it just as well, just as

9        accurately over many, many instances as a computer would?

10                   I have some material in the record that I think

11       could be read to say, no, they don't.  You are saying they

12       do, citing blank, saying what?

13                   MR. LOGAN:  Your Honor, there are a few ways I

14       respond to that.  The first would be as Mimecast has pointed

15       out, citing the specification and pointing out human

16       reviewers can do these steps, and that is one piece.  But

17       the maybe more important piece is, we're at the step one

18       phase of the Alice inquiry, and at this phase, it's really a

19       question of law for the Court to look and see, is this

20       directed to the abstract idea?

21                   Here, unlike the cases where, you know, the

22       Federal Circuit has found the factual underpinnings that may

23       need to be resolved, this is a question of law.  Those were

24       all cases at step two.

25                   So we're at the step here, we're at that first

 1    step.  Is this directed to an abstract idea?  Is this, for

 2    instance, a human process that we're potentially you just

 3    implementing on a computer?

 4              And to Your Honor's points about accuracy, you

 5    know, that would potentially even change the outcome in

 6    Alice if that were the case, because there you had this idea

 7    of using a computer intermediary, which may be able to do

 8    things more accurately than were done before.  But accuracy

 9    isn't necessarily enough to get us over the hump.  In fact,

10    as a matter of law, as Mimecast points out, accuracy isn't

11    enough to get this over the hump.

12              And the biggest issue is that, you know, I would

13    like to point out to the Court, all of these other options,

14    like determining a Hamming distance or, you know, doing

15    character comparisons, setting aside that they sort of

16    describe human processes in the first place, the way people

17    think about things, how close are words to each other, is

18    think close to thank, is then close to than, they're all

19    optional.

20              At a preemptive level, and the Court addressed

21    this in one of its questions.  At a preemptive level under

22    Alice, we have to look at, you know, what territories is

23    this claim going to be preempting?

24              And Mimecast is correct, this claim is

25    essentially attempting to preempt every way of comparing two

1    messages seeing at the display names are the same.  And then

2    if it's not from that entity, throwing it out.

3                And Your Honor asked if there was a way to look

4    at the claims and make a determination whether it's, for

5    instance, improving the technology, improving this way of

6    making, you know, this determination that's thrown out, the

7    whole process we just discussed, and while there's no bright

8    line rule, I do believe, Your Honor, that, you know, one

9    flag that the Court can see is when the claims like here are

10   claiming functional results but not really claiming how to

11   do it, that's a good indication that you're not necessarily

12   improving the technology.

13                So here it's go through and make these

14   determinations, but aside from telling you look at the two

15   items, see if they match, see if they're the same, there's

16   really no discussion about how to do this in a technological

17   sense other than applying that generic computer.

18                THE COURT:  All right.  Anything further,

19   Mr. Logan?

20                MR. LOGAN:  No, Your Honor.  I believe that's

21   all and I appreciate the Court's time.  Thank you.

22                THE COURT:  Sure.  Okay.  Thank you.

23                And then I will turn to plaintiff's side, and

24   because I ended up giving defendants' side, and I apologize,

25   I hadn't allocated the time properly because I didn't

1   realize that multiple defendants would be speaking.  Because

2   I ended up giving defendants the extra time, I will do the

3   same for plaintiffs.

4           Mr. McDavit, as you begin to make your

5   presentation, I will add on an extra 15 minutes if you need

6   it so that you're not prejudiced.  Okay?

7           MR. McDAVIT:  Thank you, Your Honor.  May it

8   please the Court, this is Jonas McDavit for plaintiff

9   ZapFraud.

10          I actually want to start with some of the traces

11  that Mr. Bell, Mimecast's counsel, left off, and he had made

12  an assertion that he said that Alice step one is where the

13  action is.  And although I vehemently disagree with his

14  characterization of the abstract idea in this case and I

15  vehemently disagree with how he characterized what the

16  specification says about the invention, I think that the

17  easiest place to resolve this case, and the reason why the

18  briefing was concentrated on step one honestly was because

19  we were rebutting the briefs, briefing of Mimecast and

20  others in this, in this, in these proceedings.

21          But if you just look at the specification of the

22  patent, the inventor tells you exactly what he did and why

23  he did it and why it's a nonconventional solution to an

24  existing problem, a problem that frankly it's surprising

25  that the defendants are still in business because the way

1    that they're characterizing it sounds like that is not the

2    case.

3              It sounds like that everything the defendants

4    are doing and selling and advertising could have been taken

5    care of long ago.  But if you just look at -- Mimecast put

6    up slide number 5 of their presentation and I'm going to try

7    to share my screen.  I hope it works.  But their slide

8    number 5 -- I hope this comes up.

9              THE COURT:  It's loading on my end.

10             MR. McDAVIT:  Okay.

11             THE COURT:  And it did.

12             MR. McDAVIT:  Good.  Okay.

13             So their slide number five, and they talk about

14   a human problem, and then later on -- I'm sorry.  I've

15   actually got the wrong, wrong slide.  I was following along

16   with Mr. Bell's presentation, so I skipped along.

17             Slide number ten actually.  This is where I

18   wanted, or -- I'm sorry.  Slide number five is where I

19   wanted to be.  I apologize, Your Honor.

20             THE COURT:  All right.

21             MR. McDAVIT:  So Mr. Bell has a slide with

22   excerpts from column 3 of the '628 patent and the excerpts

23   stop at column 3, line 51, and then goes on, and he has

24   another excerpt that stops at, again, sort of at the bottom

25   of column 3, at line 63.

1      And I just wanted, as I was looking at this, I

2  wanted to look at the next paragraph.  And so if you look at

3  the next paragraph of that, of that, of the patent, I think

4  it tells you everything you need to know about what the

5  inventor was trying to do with the patent.

6      And he says, starting at line 64 of column 3 of

7  the '628 patent, and he makes a distinction about the

8  conventional solutions that were out there, and I think

9  conventionality was the word that you were looking for, Your

10  Honor, when you're asking about step two.

11      So in contrast to typical spam messages which

12  may contain readily blacklistable terms, one of the reason a

13  phishing scam message is successful at tricking victims is

14  because it appears to be a legitimate message from, and it

15  continues at the top of column 4, in that, in that section.

16  And I will try to scroll up.  I'm sorry that it goes over to

17  the next page.

18      But it appears to come from a trustworthy

19  entity.  Terms frequently present in a phishing message,

20  such as bank or account are also very prevalent in

21  legitimate e-mails.  Again, what the inventor is telling you

22  is, there are solutions out there like blacklists.  This

23  isn't that.  Those, the conventional solutions are -- have

24  drawbacks.  They're problematic.

25      And so what the factual information that -- what

1    Dr. Jakobsson was inventing was to say, indeed, a phishing

2    message might appear to a recipient to contain verbatim the

3    text of a legitimate message sent by a legitimate entity,

4    and then he goes on to say, the degree of possible

5    customization of scam messages makes it particularly

6    difficult for existing, i.e., blacklists, e-mail filters to

7    provide sufficient protection.

8              And so how do I come up with a solution -- I

9    need to come up with a solution that's not the conventional

10    solution.  And the solution --

11              THE COURT:  Mr. McDavit, am I right that among

12    the various types of conventional solutions, that the

13    patentee was saying, hey, they may not be extensive enough

14    or good enough?  I mean, one problem the patentee was

15    pointing out was, look, you can have a particular word that

16    you can say, you know, that your electronic system can

17    utilize and say, any time you see that word, flag that as a

18    scam e-mail.  But the problem with that is that scammers can

19    get around that by just slightly altering, you know, the

20    form of that word in a way that will fool your system.  You

21    know, putting periods in between the letters or whatever.

22              And then it sounds like another way, maybe a

23    little bit kind of less explicit in the words of the patent,

24    but certainly clearly made to the Examiner, that the

25    patentee was saying, hey, let me think about some other

1    systems out there that, you know, they are okay, but they're

2    not great.  They have problems.

3              One is, you can put somebody on a blacklist so

4    any e-mails from that entity will get flagged.  But the

5    problem is you could put people on a whitelist and those

6    people could be deemed okay by your system, but the problem

7    is, you know, they might not be.

8              And so pretty clearly, I think there are a lot

9    of different ways the record has the patentee pointing out

10   how prior how electronic systems to kind of scan e-mail for

11   evidence of fraud had downsides and something about this

12   patent was trying to do better, to create a better solution.

13   Is that right?

14             MR. McDAVIT:  Absolutely, Your Honor.  The

15   patent and the portion of the spec I was reading from lays

16   out the problems of conventional e-mail security systems,

17   the reason why those problems had import to users and a

18   solution.

19             They go on to say, described herein are

20   techniques for protecting vulnerable users from malicious

21   entities, and he was directly to your point, Your Honor.  In

22   the context of talking to the Examiner, he expressly said,

23   hey, what's conventional?  What's out there?  The blacklist

24   solution, the whitelist solution.  It doesn't prevent scam

25   e-mails, phishing e-mails.

1          I have a different approach, and that is what

2     convinced the Examiner to issue this patent.  And if you

3     actually take Mimecast's articulation of the abstract idea

4     at its words, it would envelope those conventional

5     solutions, because a blacklist identifies deceptive e-mails

6     and then disposes of them.  Whitelists do the same thing.

7     The DMARC situation that is disclosed in the patent

8     specification, same thing, same idea.  It doesn't work.  Dr.

9     Jakobsson came up with a different approach.

10          THE COURT:  And so, Mr. McDavit, I think one

11     thing you're saying there is, that a step one kind of

12     argument they are making is, we actually don't think as

13     plaintiffs that the very broad, overly generecized way the

14     other side has framed the abstract idea that the claims are

15     directed to is actually correct, that it's sufficient,

16     because we've just shown you why we think the patentee is

17     saying, the claims are actually directed to something much

18     more specific that's not captured by that broad abstract

19     idea, and so an argument we, plaintiffs are making is, we

20     think the defendants' argument on step one should fail

21     because they haven't actually characterized what the claims

22     are directed to in a sufficiently specific way.  Is that

23     right?

24          MR. McDAVIT:  That's correct, your.  The cases

25     that movants are analogizing to are the kinds of cases where

1    you have a computer that is speeding up or making more

2    accurate even a human process, but we're starting at the

3    wrong place.

4              The right place to start is not the mailbox at

5    the corner.  It's not the mailroom in your office building.

6    The right place to start is e-mail security, how do we get

7    better e-mail security?  And that, the conventional

8    solutions sold by, in fact, the movants, all of them, sell

9    these type of situations is the blacklist idea, the

10   whitelist idea.  And all of those things were not sufficient

11   to stop e-mails that were malicious getting through.  And so

12   Dr. Jakobsson came up with a nonconventional approach.

13             THE COURT:  Now, let's assume for your argument

14   that I agree with you, that there would be a fact dispute,

15   and therefore, you know, and I guess this is technically an

16   affirmative defense, so therefore, there would be an

17   assertion by the plaintiff that the defendant has not

18   demonstrated that there was no plausible allegation that the

19   asserted invention here was not new.

20             You know, put differently, let's assume there's

21   a fact dispute in the record about whether this particular

22   way of comparing the content of an e-mail to what is

23   expected, that there's at least a fact dispute that it was

24   new, that the prior art systems weren't doing it, and that

25   it adds something to the art because it is new.  It's doing

1    something that wasn't done, and in a way that helps you find

2    more fraudulent e-mails.

3              I think the argument from the other side would

4    be at a step one level, if you were right and they had been

5    too general in articulating the abstract idea, if you were

6    to even add in the extra pieces that you're suggesting that

7    are the, what the claim is really directed to, you know, the

8    slightly more specific way it goes about trying to identify

9    fraudulent e-mails, that the extra piece you would be adding

10   into that definition is itself an abstract idea, or at the

11   step two stage, if I were to agree with them, that, yes, the

12   claims are directed to the abstract idea they cite and I was

13   looking at the more specific how that we're focused on at

14   step two, I think they would say, okay.  I will give it to

15   you.  It's new.  The patentee says it's new for purposes of

16   12(b)(6), but it's not new in a way that matters because it

17   itself is an abstract idea and you can't add an abstract

18   idea to an abstract idea.

19              Do you agree that that seems to be the key fight

20   that we're having here?

21              MR. McDAVIT:  I would say that's the fight that

22   the movants want to have, because what they want to have is

23   an abstract idea that is broad enough to swallow the whole

24   thing, to encompass any, any -- parse the claims such that

25   every, everything that's in the claims is part of the

1    abstract idea.  That is the fight that movants want to

2    have.

3            I would -- so setting aside the articulation of

4    the abstract idea, which I disagree with, even if you credit

5    the abstract idea that they put forward, and I think it's on

6    their slide 10, they say at the top, so the abstract idea

7    that is articulated by movants is identify deceptive

8    messages that appear to be from a trustworthy source and

9    take action accordingly.

10           If that is truly the abstract idea, we win the

11   case -- we win this motion.  They fail because that would

12   envelope the conventional approaches to e-mail security that

13   was distinguished by Dr. Jakobsson during the application

14   process and in the specification itself, because that, that

15   approach would envelope blacklists, it would envelope

16   whitelists, it would envelope the standardized approaches

17   that were used called DMARC and DKIM, and all of those

18   things were disclosed in the specification, all of those

19   things were disclosed to the Patent Office when they looked

20   at the 101 issues during prosecution.

21           So it has to be more.  The step two approach has

22   to be greater than that because otherwise, this patent, the

23   '628 patent, and later the '073 patent, none of them would

24   have issued.  The Patent Office would have said, no, you're

25   just doing the prior art.

1              So I agree with -- Your Honor was touching on it

2     and I agree, it came out in the briefing from the movants.

3     They said, hey, at the 101 stage, we're not looking at

4     novelty, and we're not looking at obviousness, so it doesn't

5     matter.  New and obvious, it doesn't matter.

6              And I agree with that except I would say, the

7     proper inquiry is whether it was conventional or not, and

8     they may disagree that it was new because they may find an

9     article published a year before the patent was issued, or

10    they might find a product that was doing something that

11    meets the, each element of the claim or some combination.

12    They might allege that later.

13             That is an obviousness, novelty, a 102/103 fight

14    that we may have later.  We're not at that stage now.  The

15    inquiry right now is was it conventional or not, and is it

16    proposing a solution beyond what was conventional?

17             THE COURT:  But I think the trick is that, you

18    know, if we agree that that analysis about

19    "conventionality," you know, what I think is probably best

20    framed as a step two analysis, but that conventionality

21    analysis, what it's not getting at is novelty.  It's not

22    getting at newness per se.  It's getting at something else.

23    What it's getting at, you know, I think what it's probably

24    getting at is, you know, there's a certain type of computer

25    add at the step two stage that isn't good enough.  You know,

1    Alice would say, the add of just do it on a computer, do it

2    faster on a computer, not good enough.

3            Even if it's novel, it's not good enough for,

4    you know, for a different conventionality reason.  And, you

5    know, it's hard to articulate exactly what it is you are

6    looking for there, but it seems like what is being assessed

7    is, is the computer add, does it promote kind of sufficient

8    specificity, sufficient articulation of how there's an

9    improvement to computer technology such that it takes you

10   out of idea-land, or potentially does, and puts you into the

11   particular articulation of an abstract idea into the real

12   world, you know.

13           And I think the other side would say here, you

14   know, put differently, let's say you're right and I think

15   that they have been too broad in the way that they've

16   articulated their abstract idea for the reasons you say.

17   But if they were to say to me in response, well, Judge,

18   fine.  Then change the abstract idea to identifying

19   deceptive messages that appear to be from a trustworthy

20   source by comparing the name of the source, the name on the

21   message to the name you expect.

22           They would say, in essence, and, you know, dot,

23   dot, dot, and take action accordingly.  They would say in

24   essence, that's all the claim does because, you know, that

25   is the broadest option.  And they would say that's an

1   abstract idea, or it's an abstract idea that we propose

2   adding on an abstract idea.

3            And I guess, you know, the fight I think is

4   about, at least the way they framed it is, is the how that's

5   in the first determining step.  Does it -- does it itself go

6   beyond the realm of abstract ideas?  Does it potentially, in

7   the step two context there would be, does it potentially

8   amount to the requisite improvement to computer

9   functionality, technology?  And so maybe, you know, you

10  could help me understand your view about why it does.

11           MR. McDAVIT:  Yes, Your Honor.  So let me go to

12  my slides real quick, because I think we address it head-on

13  and I think the articulation that Your Honor -- yes.  It

14  needs to be something in addition to the abstract idea.

15  Right.  So it can't just be make it faster with a computer.

16  I totally agree with that.  That's not this case.

17           So the determining step, I will get to that in a

18  second, but I just, I think it's helpful to look at our

19  slide number 24, so let me -- I guess I'm going to try to

20  share a screen again.

21           THE COURT:  Okay.

22           MR. McDAVIT:  And this is the one slide without

23  a page number, Your Honor.  I don't know how that happened,

24  but it's the next to last slide in our presentation.

25           And this is what the, this is the articulation

```
 1        of Dr. Jakobsson to the Patent Examiner.  And the reason why
 2        that this is something beyond what movants clarify or state
 3        as the abstract idea is because you're detecting deception
 4        by the sender of the message by identifying the
 5        communication where they sent, the sender appears
 6        trustworthy to the communication, but is not.
 7                 The current approach is, to this solution, the
 8        current approach is to e-mail security, don't have such
 9        determination.  That just doesn't exist.  And the terms that
10        in the claims that are wrapped up in this -- and I'm sorry.
11        My screen isn't coming up.
12                 THE COURT:  I'm also looking at it in hard copy.
13                 MR. McDAVIT:  Okay.  So if you look at the
14        claims of the patent, you refer to claim, I look at claim 1
15        or claim 14 is fine.  They both have it in there.
16                 The idea of who or what is an authoritative
17        entity is something that is not in the prior art, or is not,
18        was not conventional at the time.  It's because it's someone
19        who appears legitimate or trustworthy to a user, we're going
20        to try to capture e-mails or electronic communications that
21        come from that entity.
22                 Computing a similarity distance, counsel for
23        Proofpoint talked about, well, I could just go to the
24        mailbox at the corner and I could look and take a match
25        after I opened the envelope and I could see that this was --
```

1   this was a marketing advertisement, not a bill from my

2   credit card company.

3          But that's not really what's going on here.

4   We're not even getting to the point of opening that letter

5   to see if there's a match.  Computing a similarity distance,

6   the idea is you are taking indicia from a user database and

7   you are comparing it to indicia in the electronic message,

8   and you're trying to figure out in that process, is this

9   something that looks like it could be a scam?  And if it is,

10  then I'm going to take action accordingly.

11         So computing a similarity distance, yes, what

12  movants want to do is force all of that into the step one

13  analysis, but I would submit that if they don't understand

14  what an authoritative entity is, what computing a similarity

15  distance is, and then in claims 4 and 5, if they don't

16  understand that collection of terms or an equivalence

17  analysis presents factual disputes, then I think that in and

18  of itself is a factual dispute.

19         We are at step two and it's not appropriate to

20  resolve this, or it can't be resolved on the pleadings

21  because the patentee has told in the specification and has

22  told the Patent Office, these things are not conventional

23  solutions.

24         THE COURT:  And maybe while we're looking at

25  claim 14, Mr. McDavit, it would help me to kind of walk

1    through it with you to get plaintiff's understanding, you

2    know, about what the claim maybe read at its broadest level

3    would cover, because I think that could help me.

4              I mean, it seemed to me like, and tell me if

5    this is right at a very broad level, I'm not holding you to

6    this, but when I comes to the different types of

7    determinations that claim 14 makes, like the first kind of

8    determination process is almost like, is the e-mail that

9    we're looking at, does it come close enough to what might be

10   kind of the expected legitimate e-mail to kind of, to raise

11   our concerns?

12             And we have these ways of determining, is it

13   close enough such that it appears to have been transmitted

14   on behalf of an authoritative entity?  And then there's

15   another step.  And the defendants' side would say it is much

16   lesser specificity, that if we get an e-mail that falls into

17   that first category, then we're going to make some

18   determination that, in fact, it is not a legitimate e-mail.

19   And then if we do those things, we get there, then we're

20   going to do something with it.

21             Is that at a high level kind of what the claim

22   does?

23             MR. McDAVIT:  That's right, Your Honor.  So

24   there are two steps -- well, there are three steps.  The

25   last one, defendants say you take action to the message and

1    that's something that has been known, and I think that's

2    conventional because that's what blacklist did, what

3    whitelist did, what other solutions did.

4            But the two steps that are not conventional,

5    that are, that depart from that conventional solution is

6    determine, like you said, whether or not this looks like it

7    comes from an authoritative entity, and then assess, take a

8    distance, compute a similarity distance, actually do a

9    calculation to determine, have I come up with, have I

10    unearthed a malicious e-mail even though it looks like it's

11    coming from my bank, even though it looks like it's coming

12    from PayPal, even though it looks like it's coming from my

13    friend.

14            And that solution is different from than just

15    saying, hey, I'm going to put a rigid rule down and I'm

16    going to say anything that comes from this domain, I'm going

17    to excise, or a rigid rule that says, anything that comes

18    from this domain, I'm definitely going to let in.  And those

19    solutions sort of -- the horse is already out of the barn by

20    the time a blacklist or a whitelist can be updated to detect

21    malicious e-mails.

22            THE COURT:  And in terms of how we make this,

23    you know, this determination, this first determination or

24    this comparison, if we're just looking at the words of the

25    claim, and, again, let's do this at the broadest level

1    because we understand the defendants are at least arguing

2    that the broadest level is what potentially counts, though

3    we'll talk about that more in a second.

4            If I'm reading the claim, it look like, okay, so

5    we're going to determine whether the electronic

6    communication appears to have been transmitted on behalf

7    of an authoritative entity and how are we going to do that?

8            Well, we're going to compute a similarity

9    distance, okay, and between what?  Between the display name

10   and at least the name of the authoritative entity or that

11   name is retrieved from a database.

12           By the way, is display name, like an example of

13   a display name like the name of a bank?

14           MR. McDAVIT:  The display name -- so typically,

15   with e-mails nowadays, you'll have an e-mail address.  That

16   doesn't actually get displayed on your box, if you are

17   familiar with Outlook.  What gets displayed in your in box

18   is a person's name or an entity's name, which is a way that

19   people will try to spoof e-mails, because it will display

20   like, this is coming from your CEO, or coming from your CFO,

21   but the actual e-mail, which is not displayed on your

22   screen, is coming from some fraudster e-mail,

23   fraudster@gmail.com, or something like that.

24           THE COURT:  Okay.  So using an example of a

25   bank, that bank will have "a legitimate display name" that

1      shows up on e-mails.  Let's say it's TD Bank and let's look

2      at what it is, TD and Bank.  You know, two words.  That

3      legitimate kind of display name for the authoritative entity

4      is saved in a database.

5              And what we're going to do is potentially here,

6      we're going to compute a similarity distance between that

7      legitimate thing and what the display name of the actual

8      e-mail is that shows up in our, in our in box.

9              Am I right so far?

10             MR. McDAVIT:  Yes, Your Honor.

11             THE COURT:  All right.  And then as we go on

12     through it, we're going to -- so how are we going to compute

13     that similarity distance?  Well, it says wherein the

14     similarity distance is computed by a comparison of items, by

15     at least one of.  So, okay.  We can do only one of these

16     things.  We'll count.  Basing the comparison on at least one

17     of, again, a match between the display name associated with

18     the electronic communication and the display name of the

19     entity.

20             So am I right that the computing of the

21     similarity distance in that scenario, if we're using that

22     one, is really just saying, it should say TD and then Bank.

23     How close is what the display name and the e-mail to that,

24     and is it the same, or is it not the same?

25             Is that what amounts to the computation that

1    would be done there?

2            MR. McDAVIT:   I think that that is one of the

3    things that could be done to determine.   It's like the entry

4    level aspect.   Okay.   Are they the same?   Okay.   But that's

5    not really the question.   Right?   Because prior art systems

6    might have been able to catch things that were exactly the

7    same, but when now you're trying to catch misspellings, you

8    are trying to get people substituting zeros for O's.   You're

9    trying to look at spaces in between.   You are looking at

10   texts of messages, and you are using the user's information

11   to help guide the security system in order to make those

12   determinations.

13            So it's -- it's not just that they're the same.

14   It's, what are the other things that we can do to ensure

15   that the -- that fraudulent e-mails do not come through,

16   particularly once they're trying to impersonate someone

17   who's of authority, whether it's your bank, whether it's the

18   CEO or CFO of a company, that's what this is trying to

19   accomplish.

20            THE COURT:   But I think at one point there you

21   said something like, but it's not just determining whether

22   they are the same, and I think defendants' point was, no, it

23   can be.   I mean, literally, the claims, if you go with one

24   of the options, you know, what this claim can prevent in

25   terms of infringement, it's, we're going to compute a

1    similarity distance between the display name that's stored

2    in the database and the display name on the e-mail by simply

3    determining whether it's "the same."  So literally, the

4    comparison would be same or not same.  Then at the broadest

5    level, that's it.

6              Is that a way that someone could infringe if

7    they did that and only that?

8              MR. McDAVIT:  Well, I think that that would be

9    isolating that, that clause from the claims from the rest of

10   it, and I think that you would be doing what the Federal

11   Circuit and others have counseled against doing, which is

12   parsing these claims at too fine of a level, because if you

13   were to make that match and I was to read on the prior art,

14   then obviously, I would be invalid and that patent would

15   never have issued in the first place.

16             THE COURT:  So what is the more?  What is the --

17   it's not just that, Judge, all the things we just talked

18   about, you know.  You have to read it in the context of the

19   entire claim, and so when you do, what more is there that

20   matters from a 101 perspective?

21             MR. McDAVIT:  So what matters from a 101

22   perspective, again, so we're looking to see, is this a

23   conventional solution?  Is this more than what was being

24   done in the field of e-mail, electronic communication

25   security that existed before, existed at the time when Dr.

1    Jakobsson applied for a patent?

2                   And what I would point to is the, is if you look

3    at the and start with the computing a similarity distance

4    step, what you're looking for is, I am -- this is the

5    approach.  The process is I need to determine a match.  I

6    need to look at the incoming e-mails that have been received

7    at the server.  I need to look at those e-mails as they come

8    in, and I need to determine whether or not those e-mails

9    appear to be from an authoritative entity, again, which we

10   would submit needs to be, if this is a step two case, or if

11   we're talking about factual issues that need to be resolved,

12   it seems like that in and of itself needs to be resolved

13   before you can dismiss the case.

14                   But then going on --

15                   THE COURT:  I'm sorry.  What is the that that

16   needs to be resolved?

17                   MR. McDAVIT:  Based on what movants have said,

18   they apparently believe that an authoritative entity is

19   something different than what the patent says it is, and

20   what the -- I think that term needs to be construed before

21   we can resolve a 101 determination.

22                   THE COURT:  Well, that is a question I had for

23   you.  Based on the briefs, I did not understand either side

24   to be clearly saying to me, Judge, this turns on what these

25   words in the claim actually mean, because if the words mean

1    X, then, you know, potentially, motion denied, but if the

2    words mean Y, they don't.

3             It sounds like you're now suggesting you think

4    authoritative entity has to be construed, but I'm not

5    understanding why or why it matters.

6             MR. McDAVIT:  It matters because if the abstract

7    idea is so broad as to encompass what an authoritative

8    entity is, then I think movants are making the suggestion

9    that authoritative entity needs to be construed, because in

10   order to determine why this, this approach was not

11   conventional at the time of the patent's filing.

12            If the movant's articulation of an abstract idea

13   is so broad that it would encompass computing a similarity

14   difference, then that phrase also needs to be construed,

15   because that is not what Dr.  Dr. Jakobsson's patent is

16   directed to.  It's not directed to the abstract idea of

17   identifying a deceptive message and taking action.

18            THE COURT:  All right.  Maybe one other question

19   here would be, again, we've walked through the claim, and I

20   think the defendants would say the way in which this

21   determination occurs, the key one, the one in which, you

22   know, some more of the how was added, and then ultimately,

23   it got over the hump from the Examiner's perspective is that

24   you have an expected display name in a database for, say, a

25   bank.  You know, what the word or words are supposed to look

1    like.  You look at what the actual display name on the

2    e-mail is and you, and in a computerized way you say same or

3    not same, and if it's same or not same, there are

4    consequences.

5            One question to you would be, is that what the

6    patent claim can cover?  In other words, you know, can this

7    claim cover that so far, if we get down to the first

8    determining step, that act?

9            MR. McDAVIT:  I would say to Your Honor that

10   that would not cover the, what you are describing, because

11   that would be a simple blacklist.  That would be the prior

12   art solution and so it can't cover that.

13           What you're reading is a portion of the, of the

14   claim language, and I would refer back to the paragraph that

15   says computing a similarity distance, and the key phrase

16   there is computing a similarity distance between the display

17   name and at least a name of authoritative entity wherein the

18   name of the authoritative entity is retrieved from at least

19   one of the profile and the content database wherein the

20   similarity distance is computed by comparison of items by at

21   least one of, and then it goes on.

22           But the key there is that the authoritative

23   entity is what you're comparing.  You're comparing something

24   that came out of a database held by the user, a profile

25   content database that's at the user, and you are trying to

1    determine a match based on that approach.  That is an

2    unconventional approach.  It was not well understood at

3    the time.  It was, in fact, very different from the

4    blacklist approach, which would just have done the simple,

5    hey, is it the same or not same? We could do that.  But

6    that's not the approach that Dr. Jakobsson invented and that

7    is not the approach that's claimed, that the claim language

8    covers.

9              THE COURT:  So are you saying that the

10   unconventional approach, the thing that was unconventional

11   is the location of where the name or the display name of

12   the authoritative entity was stored on a server, on a

13   computer?

14             MR. McDAVIT:  No.  I'm saying the authoritative

15   entity is defined by what the user, what the user has on

16   their database.

17             So if you see, again, in the claim, the claim

18   language, computing a similarity distance between the

19   display name and at least a name of the authoritative entity

20   wherein the name of the authoritative entity is retrieved

21   from the at least one of the profile and the content

22   database, that is a user defined way of trying to get that

23   computer e-mail security rather than just say everything

24   that comes from this domain is blacklisted or everything

25   that comes from this domain is whitelisted and will get

1    through.

2              THE COURT:  I mean, was this an aspect of the

3    unconventionality that you talked about in your briefing?

4    This is not triggering like a lot of memories for me about,

5    you know, the particular thing you're talking about right

6    now as being something that was even focused on.

7              MR. McDAVIT:  Well, I think it's wrapped up in

8    the idea of whether or not computing a similarity distance

9    in and of itself was a conventional solution to this

10   problem.  And if you -- and one reason why defendants

11   focused on step one, I think, and one of the reasons why the

12   briefing might have focused on step one is the articulation

13   of the abstract idea was so broad as to encompass this, and

14   we needed to reset the framework as to say where does this,

15   where does this begin?

16             Again, it doesn't begin at the corporate

17   mailroom, it doesn't begin down at the corner, your corner

18   mailbox.  It begins with electronic communications that come

19   into your in box and what the prior art solutions were -- I

20   won't even say the prior art, just the conventional

21   solutions to that problem.

22             So -- I'm sorry, Your Honor?

23             THE COURT:  Maybe one other question is:  Are

24   you suggesting that if what the claim did and all it did or

25   all it had to do was to compare a display name stored in a,

1    in a content database with a display name that is on the

2    actual e-mail, that that would be the equivalent of what

3    either blacklists or whitelists did?  Is that what you said

4    earlier?

5              MR. McDAVIT:  Yes.  If you were going to just

6    parse the claim out and you were just to say, okay.  I claim

7    something that compares a blacklisted domain with an e-mail

8    that I received and I'm going to take action on it, that is

9    actually what the -- the articulation actually of the

10   abstract idea that defendants proffer.

11             If I were to do that, I would be reading on, and

12   I would be claiming what the conventional solutions to

13   e-mail security are.  I would be claiming what the

14   conventional, or I would be looking for an application,

15   trying to get a patent application on conventional solutions

16   to e-mail security.

17             THE COURT:  And so the way in which you are

18   saying you can understand claim 14 in a way that is more

19   than that, you know, even though it uses the phrase

20   determining the compared items are the same, what compared

21   items?  Well, the display name is because blank.  The extra

22   thing that makes it more than that is, is it the

23   authoritative entity piece and where that information is

24   stored?  Is it the use of a similarity distance, or what is

25   the more?

1    MR. McDAVIT:  It was both of those things, Your

2    Honor.  It's the authoritative entity being an entity that

3    is informed by what the user has as a content and profile

4    database.  Right?

5         The identity of the authoritative entity is not

6    based on a corporate blacklist that I said six months ago,

7    but it's based on a real-time version of what the user sees

8    as being who is and what or what is the authoritative

9    entity.

10        And then also the computing similarity distance.

11   The idea of taking a -- comparing between what exists for,

12   who is the authoritative entity as defined by the user with

13   the, with the incoming message and making that comparison.

14        So those are the two more things in claim 14

15   that I would point to, the authoritative entity and

16   computing similarity distance.

17        THE COURT:  And, lastly, just in terms of the

18   way you articulated this just in the last couple minutes,

19   you keep saying the authoritative entity that the user that

20   has articulated, or the authoritative entity being stored at

21   the user's location.

22        I don't know that when I read claim 14, I

23   necessarily understood that the claim required that this

24   content database that stores the, you know, profile

25   information for the authoritative entity had to be at the

1     user's location.  Why couldn't it be at some, you know, at a

2     content provider's location, a server, an outside server?

3               MR. McDAVIT:  It could be.  What I was saying, I

4     don't mean to suggest that this is a solution that is

5     limited to what the, what the user sees in a database

6     that's stored on the user's computer.  It could be a

7     content provider's server.  It could be at the business

8     entity's server.  It could be a Mimecast server or

9     Proofpoint server.  So I agree with that.

10              But the idea is, is that I'm comparing the, I'm

11    computing the similarity distance and comparing what is

12    stored in a database with the incoming messages, and I'm

13    doing that to determine whether or not I can, particularly

14    for the types of e-mails that are getting through,

15    blacklists and whitelists and conventional solutions to

16    e-mail security, I am using my -- I'm using the system that

17    Dr. Jakobsson invented in order to do that.

18              THE COURT:  All right.  You've got about 15,

19    20 minutes left in your hour, Mr. McDavit, and I want to let

20    you move on to the other points that you want to make on the

21    step one analysis, so let me let you do that.

22              MR. McDAVIT:  Okay.  I'm going to try to share

23    my screen and go to our slides.  If this doesn't work, we

24    can just -- I can just refer to them on hard copy.

25              Can you see my slides, Your Honor?

1              THE COURT:  I can.

2              MR. McDAVIT:  Okay.  All right.  So if I just go

3    down, and I will make this brief, but just, Dr. Jakobsson,

4    all right.  This is a person who has, who companies like

5    Mimecast, Proofpoint and Barracuda and FireEye turn to to

6    advise him on this issue, how can I make computer security

7    better?

8              And I include this because I think this gets to

9    the point of we're starting at the wrong place, and the

10   reason why defendants' abstract idea is starting at the

11   wrong place is because we're thinking about electronic

12   security like a mailbox at the corner, like the corporate

13   mailroom.  Those were analogies that it sounds like

14   defendants have backed off from, but those were what they

15   presented as saying, hey, look.  All we're doing, this is

16   like the cases that, like Symantec, where you're just

17   automating a process that could be done by a human.  The

18   whole point of this solution, the whole point of the

19   approach is, you can't do this like a human.

20             And this is from Proofpoint's own website.

21   They'll agree with this.  This is not a problem.  I think it

22   comports with our everyday existence.  If blacklist worked,

23   if whitelist worked, this graph wouldn't exist.  We wouldn't

24   have a problem of business e-mail compromise.  We wouldn't

25   have a growing problem of losses of income in the billions

1    of dollars because of violations of e-mail security.

2              And Dr. Jakobsson addressed this in his patent.

3    I mean, just look at the very beginning where he says, what

4    is the problem that we're dealing with here?  The goal of

5    people who create malicious e-mails is to craft a message

6    that looks as legitimate as possible.  And you see a picture

7    of the, of the kinds of e-mails that, you know, I think

8    Mr. Bell said that we all have seen and we all have seen for

9    a long time.  Maybe so, but conventional approaches to the

10   solution have not worked.

11             And you go down to, and the articulation that

12   Mimecast puts on its website, it's blogging about this and

13   it's saying, hey, business e-mail compromise, and I'm on

14   slide 18 of our presentation.  And this is a Mimecast blog.

15   And they are saying, business e-mail compromise originates

16   with the types of e-mail security that is out there was

17   never designed with security in mind has become the default

18   mode of important Internet communication between

19   organizations and global business leaders.  It talks about

20   there might have been some conventional security updates,

21   but it's still resulting in human error.  So how can we

22   solve this problem?

23             And it says at the bottom, security teams are

24   looking for a technical solution to what is a human problem.

25   That's fine, but Mimecast is still trying to sell its

1    product and trying to advise users, how can we better

2    inoculate users from being exposed to this, these types of

3    fraudulent e-mails?

4              And what Mr. Bell's point was, was trying to

5    say, hey, this is a human problem, but it's not a human

6    problem.  It's a computer problem.  It's making computer

7    security better, and it's just like the claims in Finjan I

8    think is a good example, because those claims were about how

9    do I make a computer product better?  How do I make a

10   computer security system that is going to protect people

11   from receiving malicious e-mails?

12             And so they spent a lot of time on this portion

13   of the claims where they talk about, and I'm on slide 19 of

14   our presentation.  They focus in on a step that is in one

15   embodiment of Dr. Jakobsson's specification, and in that

16   step he said, yes, you could -- sometimes humans might be

17   able to use what is their unique ability in order to analyze

18   e-mails, but that doesn't capture the entire step.  That

19   doesn't capture the entire process of the claim, which is

20   what we were just talking about, Judge.

21             What it's talking about is a portion of the

22   steps that you would go through, and a portion of the

23   approach in order to get to the solution that Dr. Jakobsson

24   proposed, which was comparing whether or not something looks

25   like it came from an authoritative entity with something

1    that is malicious.

2              THE COURT:  I mean, Mr. McDavit, on this point,

3    is it your position that claim 14, every step of the

4    limitation must be the way it's written, must be performed

5    by a computer process?  In other words, the way it is

6    written, a human cannot perform any part of claim 14?

7              MR. McDAVIT:  I wouldn't go so far as to say

8    that, Your Honor, because there are embodiments, that would

9    exclude certain embodiments that are described in the

10   patent.  What I would say is, is that where a human might

11   perform a portion of one step of the process might be

12   enveloped in the, in the claim language.

13             But it doesn't -- it certainly doesn't, a human

14   does not perform all of the steps and could not perform all

15   of the steps, because this is a claim that's directed to

16   electronic communications, and I will just go to my slide 15

17   of my communication, of my presentation.

18             THE COURT:  In that regard, it would be helpful

19   for me to know which steps could a human not perform?  You

20   know, which are the ones where it's possible they could

21   perform it, but which ones could they absolutely not

22   perform?

23             MR. McDAVIT:  So they certainly couldn't perform

24   the steps you talked about earlier, the receiving and the

25   parsing steps, because those are, by their terms, cannot be

1    performed by a human.  But even the determining step, and,

2    again, it goes on a long way, because there is a lot of

3    detail, and a lot of that detail was requested by the

4    Examiner when they looked at this very issue during

5    prosecution.  All right.

6           This wasn't -- this isn't, again, unlike a lot

7    of the patents that we've talked about in a lot of the cases

8    where those patents were prosecuted pre-Mayo and pre-Alice.

9    This was a patent that was issued over objections on 101

10   that happened during -- in the post Alice, post Mayo

11   universe.

12          But to get back to your question, Your Honor, in

13   a determining step, the classifier component executing on

14   one or more processors, that's the very beginning of the

15   claim.  That's not -- a human isn't going to be executing

16   its analysis on one or more processors.

17          THE COURT:  So if that's right though, if that's

18   right that the whole determining step that is then laid out

19   has to be accomplished by the use of processors, how can a

20   human -- and, again, the other side's point is even if this

21   is all just accomplished by a computer, we're trying to tell

22   you, Judge, why it could be accomplished by a human.

23          But in terms of what literally is claimed, how

24   could any of the determining step be accomplished by a human

25   if it all has to be accomplished through the use of

1   processors?

2           MR. McDAVIT:   I think the example in column 8 of

3   the patent is an embodiment where it's describing how a

4   human, a group of humans sitting down, having -- having a

5   set of communications in front of them and they're told,

6   hey, use your brain and try to kick out to see if any of

7   these come from an authoritative entity, that that could be

8   part of a step, but it feeds, it is a part of a step that

9   feeds into a loop that goes back into a computer program.

10  It doesn't make the decision on its own to dispose of the

11  communications, like I think Mr. Bell implied.  If.

12          You read the rest of that portion of the

13  specification, this feeds back into a loop where the

14  computer determines at a certain point, okay.  There is a

15  closeness between an incoming e-mail and an authoritative

16  entity that's listed in my database and I'm going to take

17  action based on whether or not this is actually from an

18  authoritative entity or it's not.

19          THE COURT:  Does the computing of a similarity

20  distance have to happen by the computer?

21          MR. McDAVIT:  The computing of the whole

22  step does.  Whether or not humans could perform one

23  portion of that to see whether or not there was a, you

24  know, a misspelling or something like that to indicate

25  whether or not there was -- you know, Acme Bank was

1    misspelled I think is an example in the specification,

2    perhaps.  But the whole step, if you look at that whole

3    determining step and then even lower than that, the

4    computing a similarity distance step, that is going to be

5    done ultimately by the computer.

6            THE COURT:  Okay.  So it sounds like in summary

7    you are acknowledging that there are some portions of this

8    first determining step that can be accomplished by humans,

9    and if they are, so long as a computer is doing some other

10    portion of the step, and particularly, maybe the final

11    portions, you know, makes the final determination, computes

12    the similarity distance, you could still have infringement.

13    And so, you know, put differently, can humans do some of

14    this stuff that's in the determining piece and even there

15    still be infringement?

16            MR. McDAVIT:  Yes, Your Honor, they could.  And

17    if you look at Figure 3 of the patent, I think it

18    illustrates where humans fit into.  It's a multistep

19    process.  Humans might fit into step 3 or 4, but the

20    computer is what's assessing the likelihood that the

21    communication was transmitted with the authorization of the

22    authoritative entity, and the computer is doing the last

23    step of classifying the received communication.

24            Whether or not a human could be involved in the

25    determination step is the likelihood the potential

1    recipient, in some embodiments, a human could be involved in

2    that step.  But Your Honor is correct, the rest of it needs

3    to be done by a computer.

4              THE COURT:  Okay.  Mr. McDavit, you have about

5    five minutes left.  You want to make sure you get to make

6    any of the other important points you make on your slide

7    before we conclude.

8              MR. McDAVIT:  I think I will just, I will just,

9    I think, follow up at slide 17 and finish up here.

10             You know, this is not a patent, and these are

11   not claims that are directed to speeding up human activity.

12   This is a -- these are claims that were drafted and an

13   approach that was developed by Dr. Jakobsson with the

14   realization that humans can't do, and are very poor at

15   understanding whether or not something that is an incoming

16   e-mail is actually a scam or not or contains malicious

17   information.

18             You could be a security professional, you could

19   be someone who is with heightened awareness, and, in fact,

20   the defendants talk about this in their, in their blog.  I

21   think I have a -- we just looked at some of their recent

22   material that they are pointing out, and I only point this

23   out is that any human, you could craft a message.  For

24   lawyers, if we got an ECF alert from the Court saying that

25   you had issued an order, Judge Burke, and it was crafted,

1    but it wasn't from the Court, it was crafted to look like

2    the Court, it came from the Court, and it had a link on it

3    that said click here for the order, for the Judge's order, I

4    can't imagine an attorney that wouldn't fall for that, that

5    would click that right away because they're interested in

6    seeing an order that came from the Court.

7          And that's the kind of information, those are

8    the kinds of things that are being created, whether it has

9    to do with current events, it has to do with Coronavirus,

10   whether it is something that looks like it comes from your

11   CEO, or it looks like it comes from your CFO asking for

12   money right away.  These things are happening and movants

13   are trying to combat that.  They are developing products

14   every day to try to combat that because they know the more

15   credible something looks, the more people fall for it, and

16   that's what Dr. Jakobsson told the Patent Office when this

17   patent was in prosecution.  He said, conventional solutions

18   do not work.

19          And, again, what we're talking about here at the

20   patent eligibility stage is not about whether it's novel,

21   not about whether it's non-obvious, not whether it's

22   valuable and the damages should be limited, not about

23   whether or not the products that they sell do, in fact,

24   infringe and meet every element of the claim.  What we're

25   looking at is whether or not the claim solution was

1   unconventional, whether or not that claim solution was

2   well-known to those of skill in the art at the time of the

3   filing.

4                    THE COURT:  Okay.  Two quick questions for you.

5   One is before we end and I go back to the defendants' side

6   for any brief rebuttal, one is the other side had said,

7   citing to cases like OIP, that if the asserted inventive

8   concept simply has the computer technology making an

9   abstract idea more accurate, that under the law, that

10  addition of greater accuracy, just like the addition of

11  greater speed from a computer, is not enough to turn that

12  added piece into an inventive concept.

13                   Do you agree that that is the law, but disagree

14  that that is what the key portions of claim 14 do, or do you

15  disagree that that is the relevant law?

16                   MR. McDAVIT:  I would say both, Your Honor.  So

17  it certainly doesn't capture claim 14.  The OIP case was a

18  case that was looking at a business method.  It was looking

19  at, and I think Mr. Bell described it, but the OIP case had

20  to do with seeing whether an e-mail, I'm sorry, seeing

21  whether a computer could implement faster or more accurately

22  offer based price limitations.

23                   That's the -- it came out of the covered

24  business method problem that a lot of the 101 law has

25  developed to try to combat, where you are saying, I have a

1    solution that I've done for years like hedging risk or in

2    the OIP case and I can do it better by using a computer, and

3    essentially, it's a different flavor of the same type of all

4    the other 101 cases that movants cite.

5         THE COURT:  Okay.  And then last question.  Is

6    there any other claim besides claim 14 that I need to look

7    at in performing my 101 analysis here?

8         MR. McDAVIT:  Claim 4 and claim 5 of the

9    dependent claims, they're dependent on claim 1.  I think

10   claim 1 is a better claim to look at than claim 14, but for

11   the purposes of your 101 analysis, you can look at claim 14,

12   and I would look at dependent claims 4 and 5, which depend

13   on claim 1, and I think also depend on claim 2 in the

14   patent.

15        THE COURT:  Okay.  And I guess related to that,

16   is there anything more you want to say than you did in your

17   brief about why the additional limitations that claim 4 or

18   claim 5 add would make a difference in the 101 analysis if I

19   were to find that claim 1 and claim 14 were ineligible?

20        MR. McDAVIT:  I think again, the key portions of

21   claim 4 and 5, and Mr. Bell addressed it a little bit in

22   his, at the end of his presentation, but essentially he

23   said, hey, look.  Everything here is abstract, including

24   whether or not you're looking at a collection of terms,

25   whether you're doing an equivalence analysis as claimed in

1    claims 4 and 5.  Those are part of the abstract idea.

2    There's nothing new here.

3              Again, I think part of me wants to go back and

4    just reject the idea that the abstract idea is well stated.

5    They want to envelope everything as an abstract idea.

6    That's my first objection.

7              But, second, even if that's true, then I think

8    that the collection of terms and equivalence analysis are

9    two terms that it appears to be there's a factual dispute

10   between the parties, because the inventor believed that

11   those things were not conventional.  They were above and

12   beyond the abstract idea that was employed by the, or,

13   excuse me, the solutions for e-mail security that were

14   employed at the time, and those, those terms I submit would

15   need to be, would need to be looked at, because if the

16   abstract idea were to encompass them, step two analysis

17   would be eviscerated.

18             THE COURT:  Okay.  Thank you, Mr. McDavit.  I

19   appreciate your argument.

20             And I will turn back to Mr. Bell first on

21   defendants' side.  As I said, I will leave a few minutes at

22   least for rebuttal and I will try to let you make the key

23   points that you have without interrupting much.  So,

24   Mr. Bell, let me turn to you.

25             MR. BELL:  Thank you, Your Honor.  Just a few

1    brief points if Your Honor can hear me.

2            THE COURT:  I can.

3            MR. BELL:  Thank you.

4            So, first, I'd like to start with Your Honor's

5    question to my friend on the other side in terms of what the

6    more is.  And looking at slide 31 of our, as far as I can

7    tell, the more that they were pointing to was the fact that

8    he used a user specific database as opposed to some blanket

9    corporate-wide database.

10           Now, maybe I misunderstood my friend, but that

11   seems to be what they were pointing to in that determining

12   step.  Apart from that, I didn't hear anything in there that

13   contradicted Your Honor's question to them of couldn't this

14   be done mentally in terms of comparing what you see on the

15   e-mail with what is in your mental database, for example.

16   And they didn't say -- I didn't take them as saying anything

17   other than that database is user specific.

18           That being the case, there are a host of claims

19   that attempt to match information to contextualize some

20   determination on a user specific basis.  For example, in

21   Symantec, you looked up a database of business rules and

22   matched it.  In Bozeman, you looked up a financial database

23   and matched information there.  In Capital One, you looked

24   up a user's database, a profile database, to determine

25   whether that person had met their budget limit or not.

1    So I don't know there can be any contention that

2    using a database to contextualize and look up information is

3    anything that hasn't been ineligible countless times.

4    So then my friend seems to rely mostly on this

5    on being an improved computer system, and I just wanted to

6    refer the Court back to a couple of cases.

7    The Symantec case for one in the specification,

8    it talked about how the conventional systems were deficient,

9    and I'm not getting it on my screen, so I apologize.  I will

10    go off the hard copy.

11    In that specification, Symantec patent says

12    conventional e-mail systems didn't work, didn't filter out

13    the bad content, and so it was going to provide the solution

14    that did in the e-mail context.

15    So merely saying that you're doing something

16    other than what conventional systems already did isn't

17    enough, and that's if you are doing it on the pleadings.

18    For example, in the Fair Warning case, this is a case that

19    tried to detect fraud.  It tried to do it using a computer

20    system that was different from prior computer systems that

21    were inadequate because it couldn't deal with different

22    types of log files, and so this purported to improve on

23    those, and on the pleadings there was no actual, meaningful

24    factual question that prevented doing it on the pleadings,

25    and that I think is true.

1          When you take a step back here, and from my

2     friend's presentation, it's even more apparent to me that

3     this is really getting at human-type activity.  Whether

4     certain steps can or can't be performed by a human

5     literally as claimed ultimately doesn't matter, because in

6     cases like Fair Warning and Symantec, they were likened to

7     things that humans could do.  And from the sound of it, it

8     sure sounds like they are saying that a simple comparison

9     between what's on the e-mail and what is in your head or

10    what is in a database, a lookup database, would well cause

11    infringement.

12          The next point that humans can't do it well, I

13    think the patent specification at column 8 again refutes

14    that notion.  The entire disposition of the message can be

15    determined by the, by the human reviewer, and it can be done

16    to decide the disposition of the message, so I think that

17    shows that humans can do it.

18          And then as to claims 4 and 5, my friend pointed

19    to the language in those claims.  I agree that Your Honor

20    doesn't need to do anything other than look at dependent

21    claims 4 and 5 within the patent, and those two are

22    ineligible.

23          Finally, as to the notion that some construction

24    is warranted, I don't think so, and I think they waived any

25    such contention.  If you look at the ECF case, for example,

1    there, the patentee had inserted in conclusory fashion that

2    they should have engaged in claim construction, but didn't

3    really tee up that dispute.  And I didn't really hear

4    anything about how a construction in this case would make a

5    difference either.

6              So in total, I think when you take a step back

7    and look at the case law, Symantec, Fair Warning,

8    CyberSource, Bozeman on one side, cases that were very

9    technologically specific on the other side such as Finjan

10   and Enfish, I think those show as a matter of law, this is

11   very clearly on the abstraction side however you want to

12   articulate the abstract idea, and even using ZapFraud's own

13   articulation of the multistep process, this all is, at a

14   minimum, very much like, if not identical, to what a human

15   can do any time they open up one of those fraudulent e-mails

16   like you see on the screen here.

17             And so for all of those reasons, we submit that

18   now is the time to grant the motion to dismiss.  We think

19   they're ineligible on the pleadings and that the Court

20   should not put the parties through and the Court through any

21   more additional proceedings on this.  We think the motion

22   should be granted, and we thank the Court for your time.

23             THE COURT:  Mr. Bell, just one question for you,

24   which is the plaintiff, one of the earlier arguments it made

25   was that at step one you have wrongly formulated the

asserted abstract idea, that you've done it in too broad of

a way, and the reason why the plaintiffs argued that, they

said, Judge, clearly, the patent talks about prior art

methods, that it is not -- you know, that are disfavored,

and so does that patentee back and forth with the Examiner,

and among those were methods that focused on keywords that

relate to fraud or methods that used the blacklist.

            And they said if you know the defendants have

not properly or articulated the abstract idea at step one

because their abstract idea is so broadly articulated, it

would encompass those prior art methods that were being

discredited.

            Why isn't that line of argument a good one?

            MR. BELL:  Well, I think at the end of the day,

whether you articulate the abstract idea slightly more

narrowly -- in other words, we would be fine with

articulating it as ZapFraud has done in this multistep

approach.  But even at the broader level, we think this is

directed to that for the same reasons, for example, in Fair

Warning, where you had very specific claims and a specific

difference over the prior art, and nonetheless, the Federal

Circuit said, well, this is really mental activity, steps

that a human would do in looking to identify improper access

to a patient's records.

            So whether you phrase the abstract idea to

1    specifically include all of the individual steps, it's a

2    principle going back to Alice and, for example, to

3    Ultramercial, where it looked to the claim steps as a whole

4    and said this is the type of stuff that humans do.

5              So however it's actually articulated, when you,

6    Your Honor, take a step back, we submit that a human could

7    do that.  We have done all of that in this session today,

8    and therefore, even it is completely new and a great idea

9    and takes it outside of conventional systems, that

10   ultimately is not the inquiry.  The inquiry is whether there

11   is something inventive in addition to the abstract idea, not

12   simply whether it was well-known, conventional, or routine,

13   the system as a whole.

14             THE COURT:  Okay.  Thank you, Mr. Bell.  And,

15   Mr. Logan, I will turn to you.  Is there anything you wish

16   to add to your colleague's rebuttal?

17             MR. LOGAN:  Yes, Your Honor.  Just very briefly,

18   I'd like to address a couple of points that came up during

19   the rebuttal and the arguments before it.  One would be to

20   note that when ZapFraud was discussing what it said were the

21   unconventionality elements here and during the step two

22   discussion, it mentioned that it didn't believe that it

23   could just be as simple as matching two things because that

24   was something that was already known in the prior art.  But

25   that certainly isn't a way to interpret these claims.

1         What the claim language says in a very specific

2    way, and this also goes to the point of whether we need to

3    construe the term, you know, comparing the similarity

4    distance or something of that nature.  The claims do that.

5    They define it, and they say that you compute this

6    similarity distance by, with one option being seeing if the

7    two things are the same.  And if that was known in the prior

8    art, as ZapFraud said during its argument, then that's a

9    conventional process.  That's something that was already

10   known, even within the art of these electronic

11   communications.  So that is one point we'd like to put

12   forward.

13        Another issue that came up was about

14   authoritative entity.  And I believe Your Honor got that

15   right, which is, really what the authoritative entity is for

16   these claims isn't really particularly important, because

17   what's being compared here are the display names, not the

18   authoritative entity themselves.

19        So the question is, if looking at the display

20   name for an authoritative entity versus a display name or a

21   message and seeing if they're the same as an abstract idea

22   or if it's conventional, then that holds, you know,

23   regardless of any special construction that they now raise

24   that they think should be applied to the term authoritative

25   entity.

1          Beyond that, I'd like to just briefly address

2    the Court's question about whether there's a certain type of

3    computer add at the second stage that isn't good enough even

4    if it's novel, and I believe, Your Honor, that that is more

5    or less addressed in Alice, which is it's not novel to just

6    add this and say do it on a computer.  And if you look at

7    these determining steps, the one that ZapFraud really

8    drilled down on during its presentation, what ZapFraud was

9    looking at here was saying, okay.  These determining steps

10   are what's special.  This is sort of where we are.  This is

11   what the computer is doing.  This is how we're improving the

12   computer.  But at the end of the day, it's just saying, look

13   and see if two things are the same, and it adds a little

14   language there about using processors to do it.

15          And, Your Honor, I would submit that saying used

16   processors to do this is not particularly different than

17   saying do it on a computer, which is essentially where we

18   are in this case.  Regardless of whether a computer might do

19   it more efficiently, more quickly or more accurately, we're

20   just back to taking that human process and saying, use

21   processors to do it instead of doing it the way it was done

22   before.

23          And that really leads to the closing point,

24   which is, you know, ZapFraud's claims here aren't limited to

25   be extreme examples.  ZapFraud very obviously wants to talk

1  about, you know, computing similarity distance, make that

2  sound like a big mathematical computational intensive

3  process, focus on terms like Hamming distances and different

4  things like that.

5          But the claims aren't limited in that way.  The

6  claims are limited to the claim language and the first

7  example is just see if these two things are the same.  And

8  wanting to read more in the claims than are there is really

9  a lot of the argument that ZapFraud has made.

10          One example, Your Honor, would be ZapFraud

11  took issue with my example of looking at the marketing

12  messages, and ZapFraud said, well, our claims don't talk

13  about looking inside the envelope.  But I would direct Your

14  Honor to slide 9 of Proofpoint's presentation.  The step

15  that deals with that just says, determined that the

16  electronic communication was not transmitted with

17  authorization.  Like with the rest of ZapFraud's claims,

18  there's no meat there, there's no beef.  It's just simply

19  make this determination without any guidance about really

20  how to make it in the claim language.

21          So there's nothing that would preclude me from

22  opening the envelope and saying, well, this is a marketing

23  message.  This isn't actually a message from my bank.  And

24  that kind of goes at the heart of the problem with these

25  claims.  They're claiming an abstract idea.  They are doing

1    it in functional language.  They don't tell us any way to

2    improve how a computer is doing it.  And for that reason,

3    Your Honor, these claims should be invalidated under Section

4    101.

5                    THE COURT:  All right.  Thank you, Mr. Logan.

6                    All right, counsel.  So we've finished the

7    arguments with regard to Section 101.  We have a motion to

8    dismiss from Barracuda's side that argues that certain

9    elements of indirect infringement and willful infringement

10   claims were inadequately pleaded.  I've allocated 20 minutes

11   a side.

12                   So let me turn to counsel for Barracuda to make

13   their argument and then we'll give plaintiffs the

14   opportunity to respond and then a chance for brief rebuttal.

15                   Who is going to speak on behalf ever Barracuda

16   networks?

17                   UNIDENTIFIED SPEAKER:  Your Honor, Ms.

18   Khachatourian will be speaking for Barracuda.  It sounds

19   like she has a little technical issues.

20                   THE COURT:  Sure.  We've all been there, even

21   today, so no worries.

22                   MS. KHACHATOURIAN:  Your Honor, can you hear me?

23                   THE COURT:  I can.  Yes, Ms. Khachatourian.

24                   MS. KHACHATOURIAN:  Great.  Good morning.  Good

25   afternoon, Your Honor.

1           I will make my argument brief because I think I

2   know you've already read the papers, but if I could just

3   frame the argument.

4           Essentially, Barracuda is moving to dismiss the

5   indirect infringement and willfulness claims because of a

6   failure to plead either pre-suit notice or knowledge of the

7   patents in suit, and even if post-suit knowledge was enough,

8   the way in which they have pled intent is not sufficient.

9           Ultimately, I think Your Honor needs to make a

10  call upon which line of cases Your Honor wishes to follow.

11  I think our briefs address pretty clearly there has been a

12  split of authority in this district.  Some of the judges

13  have said pre-suit knowledge isn't sufficient, is required.

14  Some have said they're not.

15          Most recently, we filed a notice of supplemental

16  authority.  Judge Connolly, who is the Judge assigned to

17  this matter, issued two cases, the Dynamic Data case, and

18  another case where he's following the line of cases that

19  requires pre-suit knowledge and also requires more than

20  just pleading that a company like Barracuda sells products

21  or markets products, which is frankly, you know,

22  unremarkable.

23          And so the bottom line is, is that with respect

24  to the '628 patent, Barracuda is asking the Court to follow

25  the line of cases that require pre-suit knowledge and

1    dismiss ZapFraud's indirect infringement claims, and the

2    same with willfulness.

3            And if Your Honor were to follow the line of

4    cases that says post knowledge is sufficient, we would point

5    out in the three versions of ZapFraud's complaint they've

6    already amended twice now, they use the phrase at least

7    since the filing of the complaint.  And so regardless of

8    which line of cases you follow, we believe that that

9    language is too wishy-washy to just be blunt.

10           What does that mean?  At least until the filing

11   of the complaint.  So then did I know it before, did I know

12   it later?  What does that mean?  So either way, regardless

13   of which line of questions you follow, their pleading is not

14   sufficient.

15           With respect to the '073, that patent issued a

16   month before the second amended complaint.  Logic simply

17   dictates that with respect to indirect infringement and

18   willfulness, it should all be dismissed.  How can a company

19   intentionally infringe if it's added to the complaint within

20   a month of issuance?  Companies just don't work that

21   quickly.

22           So from Barracuda's perspective, regardless of

23   which line of questions you follow, one with respect to the

24   '628 patent, it's not pled appropriately even if post-suit

25   knowledge is sufficient, and with the '073, it should just

1    be knocked out completely.  And if Your Honor weren't

2    convinced on that, at least with respect to the indirect

3    infringement claims, simply marketing and selling your

4    product without additional obligations isn't sufficient.

5              I also wanted to clarify that in our first line

6    of briefing before the second amended complaint was filed,

7    Barracuda did argue that there was this inconsistency in the

8    pleadings because, with respect to the first complaint

9    compared to the first amended complaint, it was, you know,

10   as of the filing of the complaint and the complaint was

11   never defined, and so we made a little bit of muss about

12   that.

13             THE COURT:  Right.

14             MS. KHACHATOURIAN:  But that inconsistency was

15   addressed in the second amended complaint.  So since that

16   portion is resolved, while it doesn't affect what Barracuda

17   is asking for, I just wanted Your Honor to know that that is

18   no longer at issue.

19             THE COURT:  Thank you.  That's helpful.

20             Just two quick questions, Ms. Khachatourian.

21   One is about post-suit notice and the other is about the

22   marketing issue.

23             On the former --

24             MS. KHACHATOURIAN:  Your Honor, I'm sorry.  I

25   can't hear you.  Okay.  I can hear you now.  I'm sorry.

1          THE COURT:  Okay.  So the first question is

2     about the post-suit notice issue, and I can hear we're

3     having a lag a little bit, so I will try to speak slowly.

4          I take your point from the cases that you cited,

5     including the most recent one cited supplemental authority,

6     that -- can you still hear me okay?

7          MS. KHACHATOURIAN:  I can.  The feedback stops

8     if I take the mike off.

9          THE COURT:  Got it.

10          So I get your point that it's pretty clear

11     that Judge Connolly believes that if the first complaint in

12     a case, you know, the case opens with the filing of a

13     complaint, and in that complaint the patentee says, I

14     acknowledge.  The defendant has never heard of this

15     patent, so today, in the filing of this complaint, it's

16     the first notice I'm giving the patentee, and I'm going

17     alleged that the patentee indirectly infringes or wilfully

18     infringes.

19          It seems pretty clear that Judge Connolly has

20     indicated that is not sufficient, you can't use the filing

21     of the very complaint, initial complaint in the case to

22     demonstrate knowledge and/or a viable indirect infringement

23     or a willful infringement claim.

24          I think a question would be, if you later have

25     an amended complaint or a second amended complaint, which

1    for purposes of the indirect infringement claim, for

2    example, points back to the filing of the initial complaint

3    as a date and time in which the patentee did have notice of

4    the patent and did have notice of how they infringed, the

5    question is whether either Judge Connolly would think, or I

6    should think that giving notice in that way, in other words,

7    so in that sense, the second amended complaint is not in

8    itself the act that is said to have given notice, and,

9    indeed, it's not a situation then where only in some way

10   metaphysically after that complaint is received, could the

11   allegation of infringement even possibly happen?  It hasn't

12   happened yet.  It would be a scenario where you would be

13   pointing backwards to a prior event, albeit the filing of

14   the initial complaint in the case to help demonstrate

15   knowledge.

16              Is it clear in your view that either Judge

17   Connolly or our case law says that that scenario would not

18   allow for an induced or indirect infringement claim at least

19   dating as of the filing of the initial complaint if there

20   was a later complaint filed?

21              MS. KHACHATOURIAN:  I'm so sorry, Judge Burke.

22              THE COURT:  Don't worry.

23              MS. KHACHATOURIAN:  Can you hear me?

24              THE COURT:  A little echo, but I can.

25              MS. KHACHATOURIAN:  Can you give me one second

1    to see if I can fix this?  I'm so sorry.

2                (Pause.)

3                MS. KHACHATOURIAN:  Judge Burke, can you hear

4    me?

5                THE COURT:  That's way better.

6                MS. KHACHATOURIAN:  Okay.  I can't hear him.

7    Hold on.

8                (Pause.)

9                MS. KHACHATOURIAN:  Sorry, Your Honor.  I tried.

10   I can't fix it.

11               THE COURT:  No worries.  You know, and I'm not

12   sure if there will be a way for us to do this, but the

13   bottom line is, you still have an indirect infringement

14   claim, you know, dating back to the filing of the original

15   action.

16               MS. KHACHATOURIAN:  Your Honor, I believe Judge

17   Connolly's cases indicate that you have to allege also the

18   intent at the time of infringement, so I am not aware of a

19   scenario where you could do that in the present proceedings

20   where we're at.  So, in other words, if they wanted to amend

21   a year from now to say sort of as of a certain date, you

22   know, we have knowledge because of the complaint and

23   something came out in discovery that indicated that we had a

24   specific intent to infringe, I suppose they could amend the

25   complaint, but based on Judge Connolly's rulings as I read

1    them, it goes hand in hand.  How can you have an intent to

2    infringe at the time of the complaint when you've just

3    received notice?  It would have to be some conduct that was

4    discovered after the complaint was filed in order in my view

5    to satisfy Judge Connolly.

6              THE COURT:  Okay.  And then, lastly, with regard

7    to the marketing piece, if it was the case as I think it's

8    asserted here that the use of a product that is sold by,

9    say, Barracuda is alleged to infringe, i.e., the whole

10   product, the use of it infringes, and then someone alleges,

11   and they explain why, you know, the use of the product would

12   infringe, well enough.

13              If they also said, and, look, Barracuda, like,

14   it markets this product to people.  It sells it to people,

15   and the doing of that, just the marketing of it, the selling

16   of it, even if I don't allege a whole lot more facts about

17   exactly how they do that or what color are their marketing

18   documents or whatever, you know, that's an act of

19   encouraging somebody to use.

20              And so maybe that's why they would say in our

21   case law, even if you have fairly sparse allegations that

22   a product was sold or it was marketed by infringement, if

23   the whole product is alleged to infringe, that should be

24   enough.

25              What do you say in response to that?

1            MS. KHACHATOURIAN:  Your Honor, my response is

2    that according to Judge Connolly's recent cases and the line

3    of cases he is following, you have to allege more than just

4    the basic marketing or selling because you have to allege an

5    intent to infringe.

6            So the fact that I may market the Barracuda

7    Sentinel, which is a product they name in the complaint,

8    without something more, whether it's the way in which I

9    market it, the features that I market, there has to be

10   something more to show that whether explicitly or

11   implicitly, the way in which I'm marketing the product and

12   the way in which I'm selling the product perhaps and the way

13   I discuss the features or the like show that I had an

14   intent.

15           I mean, just by definition, you know, intent is

16   something that you are doing on purpose, and if I'm just

17   selling a product without more, it's not going to show that

18   I intend to infringe just by virtue of the fact that you

19   served a complaint on me and now I know about the patent.

20   What if my marketing hasn't changed?  So what?

21           THE COURT:  Is there a case of Judge Connolly's

22   where the use of just the word marketing is not enough?

23           MS. KHACHATOURIAN:  So if you look at Judge

24   Connolly's cases, if you would give me one moment.

25           THE COURT:  And put differently, I had

1    understood --

2              MS. KHACHATOURIAN:   He says that you have to

3    show, you have to show something more than just marketing

4    and selling.   He has rejected similar types of allegations.

5    So if you look at, for example, Dynamic Data has not stated

6    a claim for induced infringement because it has not

7    plausibly alleged that mLogic knew that its products

8    asserted the infringed product.   The only allegations about

9    mLogic's pre-suit knowledge of infringement are conclusory

10   statements that merely recite the legal requirements for

11   induced infringement.

12             He goes on to say, Dynamic Data's complaint also

13   alleges in each count that mLogic had post-suit knowledge of

14   infringement by way of this lawsuit, but such allegations do

15   not plead knowledge of infringement because the complaint

16   itself cannot serve as the basis for a defendants'

17   actionable knowledge.   And then he goes on.

18             So based on what he said, if the service of a

19   complaint cannot be the basis for inducement, then simply

20   selling your product or doing marketing isn't going to be

21   enough.

22             He also stated, Dynamic Data has failed to state

23   a claim for enhanced damages based on willfulness because it

24   has not alleged any facts establishing mLogic's knowledge of

25   infringement.   Dyamic Data argued that it properly pleads

1    pre-suit knowledge of the asserted patents by mLogic

2    sufficient to sustain at the pleading stage a claim of

3    willful infringement.  And even this the Judge goes on to

4    say that the complaint isn't enough.

5                In the second Data Dynamics case, Judge Connolly

6    said -- and you can hear me, Your Honor?

7                THE COURT:  I can.

8                MS. KHACHATOURIAN:  Perfect.

9                Dynamic Data argued that its complaint plausibly

10   alleges knowledge of infringement because each count alleges

11   that Bright Cove was aware that its accused products

12   allegedly infringed under the filing of the complaint, but

13   such allegations do not plead knowledge of infringement

14   because the complaint itself cannot serve as the basis for a

15   defendants' actionable knowledge.

16               The purpose of a complaint is not to create a

17   claim, but rather to obtain relief for an existing claim.

18   For that reason, the complaint itself cannot be the source

19   of the knowledge required to sustain claims of induced

20   infringement.

21               And, again, the Court goes on to say something

22   very similar for willful infringement.  So based on these

23   cases, if you look at the actual allegations that were made,

24   they were very similar to what ZapFraud has done here, and

25   so mLogic dictates that if the filing of the complaint in

1    and of itself isn't sufficient knowledge for inducement or

2    willfulness, the fact that you market or sell your products

3    without something more isn't enough.

4              THE COURT:  Okay.  I think I understand the

5    issues, and, Ms. Khachatourian, thank you.

6              And I will articulate what I've been thinking so

7    both for rebuttal and the other side.  I can understand the

8    argument that the date that this case against Barracuda was

9    initiated, the first complaint, literally, at the moment,

10   the plaintiff is crafting that complaint and really filing

11   it.  If it acknowledges that the defendant, Barracuda, had

12   never heard of this patent, it never heard of it before the

13   date of that original complaint, I understand why it is the

14   case or can be said that simply within that first complaint

15   a party alleges that the defendant had in directly infringed

16   and has willfully infringed, that the complaint can't set

17   out a claim like that, because, heck, the other side hasn't

18   gotten a complaint like that or, metaphysically, they have

19   gotten it because it was filed on the docket.  It's just not

20   plausible to say that they are guilty of something that

21   hasn't even happened basically when that document is filed.

22             I think the question is whether Judge Connolly

23   means or whether I ultimately think let's say a hundred days

24   later there is a first amended complaint filed, and in that

25   first amended complaint, the patentee is saying, look, the

1    date in which the defendant first knew about this patent for

2    purposes of indirect infringement is the date of the

3    original complaint.  That's when indirect infringement and

4    willful claims will start.

5                    Then, finally, the complaint, it can give them

6    notice.  It can be a thing that gives them notice of the

7    patent and it can be a thing that explains to them why it is

8    that they infringe the patent in some detail for purposes of

9    indirect infringement and willful infringement.  It just

10   can't do it if it itself is the very first thing that is

11   supposed to have given them knowledge.  But if there was a

12   prior complaint that did, it could.

13                   I think that's the question both in terms of

14   what Judge Connolly may have meant and what I think is

15   correct as well.  I know in the willful infringement

16   context, I said for purposes of willful infringement in my

17   view, I thought that an amended complaint could point back

18   to an original complaint for knowledge purposes.

19                   Okay.  Thank you, though.  I think that helps

20   clarify what the issue is.

21                   Let me turn to plaintiff's counsel and give them

22   a chance to say anything they wish to say about these

23   indirect infringement or willful infringement claims.

24                   MR. McDAVIT:  Yes, you.  Joseph McDavit for

25   ZapFraud again.

1            May it please the Court, and I agree with Your

2    Honor, you know, what we're talking about here, we've,

3    ZapFraud has already amended the complaint twice actually in

4    this case.  It has already pointed back.

5            So there is no dispute that Barracuda had

6    knowledge of the patent, had knowledge of the accused

7    products, had knowledge of the way we think that they

8    infringe the claims, and there's actually no dispute as far

9    as I have heard that there's, that they continue to sell

10   their product and advertise their product to others and do

11   so, you know, willingly, willfully or blind to the, to the

12   reality that they are doing that.

13           Now, I guess, you know, so I have -- I have a,

14   you know, I briefly articulated the legal bases for why we

15   think that their cases are wrong or why they don't

16   necessarily talk about the specific issue of indirect

17   infringement or the pleading standards to allege indirect

18   infringement or willful infringement, but I guess I would

19   just start as a practical matter here.

20           You know, sometimes you have disputes in an

21   indirect infringement case where the economic realities of

22   the case, the damages clock, when it starts and when it

23   stops is a very big deal, but this isn't one of those cases.

24   I mean, the facts of when Barracuda became aware of the

25   patents-in-suit and ZapFraud's allegations aren't in

1    dispute.

2              The breadth of discovery that will be needed in

3    this case to, let's say even you grant their motion for

4    indirect infringement or willful infringement.  I'm going to

5    take the same discovery and I don't think Barracuda is going

6    to stop from taking the same discovery.

7              So if we're just talking about putting lawyers

8    to amend the complaint a third time to solidify what we

9    already know is true, I don't think that's a particularly

10   good use of anyone's time, and it doesn't sound like -- it

11   sounds like Ms. Khachatourian, if we were to pull something

12   up in discovery and we were to amend again, she wouldn't

13   object to it.

14             So if all we're talking about is do we have to

15   amend the complaint another time to satisfy the formality

16   that Ms. Khachatourian is asking for, then I just don't, I

17   don't see the practical import of what we're doing here.

18             I think the Court should deny Barracuda's

19   motion, allow discovery to proceed in this case, and, you

20   know, if the Court were to grant Barracuda's motion, there

21   would be no change in what the, the information that we

22   would seek to discover from Barracuda, the depositions that

23   we would take, the types of information that would lead us

24   to present a case of indirect infringement or willful

25   infringement at trial would be the same kind of information

1    we would be entitled to discover if only direct infringement

2    were in the case.

3                So, you know, I think that is a good way to

4    think about where we are in the case.  We've already amended

5    a couple times.  There's no question that Barracuda knows

6    what we think infringes, which patents are going to be in

7    the case and so forth.

8                With respect to the law, I guess the things I

9    would say, the pleading standards that Ms. Khachatourian is

10   trying to hold us to is just not what the law is.  It sounds

11   like what she's looking for are infringement contentions and

12   something that we would put in an expert report or something

13   we would put in summary judgment.

14               What we're required to do is plead a plausible

15   case as to why they infringed and we've done that for

16   indirect infringement.  We identified the product that's at

17   issue.  The there are users that use that product and

18   there's no dispute about that.

19               In terms of willful infringement, again, we

20   have -- the original complaint perhaps under a certain

21   metaphysical theory like you articulated, Your Honor, I can

22   understand the sort of philosophical objection to saying I

23   just found out about a complaint, there's no way I could

24   willfully infringe, but we're not -- this isn't the original

25   complaint we're talking about here.  We're talking about the

1    second amended complaint and we're talking six months or so

2    after that was filed.  And I will just note that Barracuda

3    didn't object to us filing it.

4              They knew -- we e-mailed them the complaint

5    beforehand, the complaint and the '073 patent beforehand and

6    they didn't object to us filing it.  So there's no question

7    they know about it.  There's no question they know what

8    products are at issue and our theory of infringement.

9              And I think to just -- it seems like what we're

10   talking about here is just whether or not ZapFraud has to

11   amend its complaint again to resolve the philosophical

12   objections that Ms. Khachatourian is raising.

13             And I will just say for the record the Dynamic

14   Data case that she pointed to from Judge Connolly, it

15   doesn't raise the pleading standard for willful

16   infringement.  In fact, I'm looking at the Dynamic Data

17   Technologies case for mLogic Holdings.

18             He says at the end, and this is at 2002 Westlaw

19   4365809, he talks about that.  He says, if the operative

20   pleading alleges facts from which it can be plausibly

21   inferred that the party accused of infringement had

22   knowledge of the asserted patent and knowledge of the

23   parties' alleged conduct constituted induced or contributed

24   to infringement of the asserted patent, then the pleading

25   can stand, and that's what the law is.

1              And so, you know, if we get down the road to

2     trial and we don't carry our burden to show that there was

3     willfulness, that's one thing, but at the pleading stage

4     we've alleged that the kinds of materials and the activities

5     that Barracuda and the other defendants have, those

6     activities constitute willfulness or at least being wilfully

7     blind to the patent as they know it exists.

8              THE COURT:  Thanks, Mr. McDavit.  I don't think

9     I have any questions.

10              Ms. Khachatourian, is there anything you want to

11     add?

12              MS. KHACHATOURIAN:  Yes, Your Honor, if I may.

13              First, I take issue with a few things that my

14     friend on the other side has stated.  First, the mLogic case

15     clearly states on the last page, to state a claim for

16     enhanced damages based on willful infringement, however,

17     Dynamic Data must allege not only that Dynamic Data had

18     knowledge of the asserted patent, but also that mLogic had

19     knowledge of its infringement of the asserted patents.

20     Accordingly, I will dismiss Dynamic Data's claims for

21     enhanced damages.  That's number one.

22              Number two -- number two is that all of

23     ZapFraud's allegations against all of the defendants are

24     the same when it comes to indirect infringement and

25     willfulness.

1          So this is not philosophical.  There is case

2     law, Iqbal/Twombly, that I know that everyone is familiar

3     with that is supposed to protect defendants from this type

4     of weak pleading.  You can't just say at least until the

5     filing of the complaint when you've amended twice and then

6     say that we've done something intentional.

7               THE COURT:  No, I hear you.  I hear you.  I was

8     going to say --

9               MS. KHACHATOURIAN:  I'm sorry.  I can't hear

10    you.  Go ahead.

11              THE COURT:  I'm sorry, Ms. Khachatourian.  I was

12    going to say I hear you about the at least as of the filing

13    of the complaint language.  Let's assume I just think that

14    means as of the complaint, you know.  I think the only

15    question I would have for you is, like, I think what you're

16    arguing for, and, again, think about this just in the

17    context of a later amended complaint asserts indirect or

18    willful infringement and points back to the triggering date

19    as the date of the filing of the original complaint, because

20    in that complaint, surely, the other side was given notice

21    of the patent.  It was attached.

22              And let's imagine a world where in that

23    complaint, the defendant went just to leaps and bounds and

24    explained in tremendous detail exactly how that party

25    infringed.

1            I think what you are arguing for is that it

2      doesn't matter, because that stuff, that information was

3      found in a document called a complaint, it can't count for

4      notice purposes, knowledge of the patent and knowledge of

5      why you infringe if referenced in a later complaint.

6            And I guess my question would be, how come?  And

7      then like, relatedly, what is in the amended complaint the

8      defendant had said, well, look.  We think our willful

9      infringement and indirect infringement claims should begin

10     at the date of the filing of the original complaint because

11     in that document we attached the patent and we explained how

12     it infringed, but the next day we just copy and paste the

13     words in the complaint into a letter, and we sent the letter

14     to the other side, which they got that day.  And so

15     alternatively, the day after we filed the complaint.  But by

16     simply giving them the same info, they knew of the patent

17     and they now how they infringed.

18            I mean, couldn't you have a claim, again,

19     articulated in a later amended complaint that sets out an

20     indirect infringement or willful infringement claim that

21     would start, you know, the day after the first complaint was

22     filed?

23            MS. KHACHATOURIAN:  I would say no because if I

24     get a letter right before you file the complaint, that goes

25     back to my argument on the '073, where how can I have

1    intentional conduct and how can I have notice if within the

2    time of issuance of the complaint, it's such a short amount

3    of time, number one.

4              THE COURT:  No, I know the '073 is a different

5    scenario because unlike the other patent in this case is in

6    a different box, and that's really I think what I'm talking

7    about, because there you had an original complaint, a first

8    amended complaint, a second amended complaint and, you know,

9    the second amended complaint I think is basically saying,

10   look, our infringement claim as to that patent, the '628,

11   you know, the clock for damages starts on the date of the

12   filing of the original complaint, because we acknowledge,

13   they didn't know about it before.  That's the date we first

14   gave them notice of the patent.  That's the date we first

15   gave them notice of how they infringe.

16             In that scenario, it seems like what you are

17   saying is, no, because that notice was given in a document

18   titled an original complaint, I think the law is it doesn't

19   count.  And I'm saying is what you are arguing, like, it

20   doesn't count because nothing that happens after the date of

21   the original complaint could count to satisfy an element of

22   indirect or willful infringement, because like what if the

23   next day they just took the same text that was in that

24   original complaint and put it in a letter and delivered it

25   to you?  It seems like why couldn't you have a complaint

1    that began there for timing purposes the day after the

2    original complaint?

3              Do you know what I mean?

4              MS. KHACHATOURIAN:  I do, Your Honor, and I

5    would say that because in addition to knowledge, you have to

6    have intent, and so in your scenario, if they filed an

7    amended complaint, the -- they perhaps might be able to go

8    back to the original complaint and say, well, you have

9    knowledge at least up until we filed the original complaint,

10   and then here's all of your intentional conduct since.  But

11   the date of damages would still start to accrue from the

12   date of the intentional conduct.  You would have to show

13   that the conduct was continuous from the beginning of the

14   complaint filing date to when the intentional conduct arose.

15             Now, I know some of this is hypothetical, but

16   ultimately, you know, back to the point.  Twombly is

17   supposed to protect us because intent is serious.  Willful

18   enhanced damage is serious.  So while they might be able to

19   relate back to the original complaint on the '628 for

20   notice, that is not necessarily true for intent, and so it's

21   really a two-prong test.

22             THE COURT:  What if they say in the second

23   amended complaint, what we did was we said, look, they knew

24   the '628 is the date of the original complaint.  They knew

25   how they infringe because we told them in a lot of pages,

1    and they continue to sell their product.

2              And so did they intend from the date of that

3    original complaint up until now, the date when we're filing

4    this claim in the second amended complaint to infringe, and

5    did they do so knowing of the patent and knowing how they

6    did it?  Sure.  We told them how they did it.  They kept

7    selling the product, so that's sufficient for intent

8    purposes.

9              Isn't that enough?

10             MS. KHACHATOURIAN:  Your Honor, then it would be

11   enough in every case, ever, and I don't think that's what

12   Twombly/Iqbal and what Judge Connolly's cases require.

13             Then all we could do is what ZapFraud did, which

14   is allege these generic allegations against everyone and

15   then just say, well, I'm entitled to enhanced damages

16   because at some point I gave you infringement contentions.

17   That is not the law.

18             At the pleading stage, you have to do more than

19   just recite the generic language from statute, and that's --

20   in fact, they did worse than that.  They said at least as of

21   the filing of the complaint.

22             And so, you know, my friend on the other side

23   says it's not going to change the discovery we asked for or

24   anything like that, but it will.  Their specific discovery

25   pointed to willfulness that every lawyer on this video has

1  propounded, and I'm sure Your Honor, when you were in

2  private practice, did yourself.

3          So it just doesn't pass the, you know, the test

4  to say that if inducement is dismissed, that doesn't cut the

5  discovery.  You're going to be going into customers, you're

6  going to be going into a lot of different things in terms of

7  what we have told our customers to do and all the rest of

8  it.  So if Your Honor were to dismiss at least at the

9  pleading stage indirect infringement or willfulness at this

10  time, it would narrow the scope of discovery in this case.

11          And I also would just like to address that, you

12  know, it's frankly a little unfair when someone is being

13  cooperative and agreeing to amend a complaint rather than

14  fight about it and specifically reserve their rights to move

15  to dismiss, to then turn around and somehow use that against

16  them with notice.

17          From our perspective, it's clear that ZapFraud

18  has no basis to accuse Barracuda of indirect infringement or

19  willfulness, and their argument today when they are pointing

20  to our agreement to amend the complaint as some factual

21  basis for doing so just doesn't pass muster.

22          THE COURT:  Okay.  Fair enough.  Thank you.

23  That's very helpful.  I think I understand what the issue is

24  there and it helps me.

25          All right, counsel.  Well, thanks to all of you

1    for hanging in there through various technical difficulties.

2    The pandemic obviously has lots of effects and one is that

3    it can make things a little bit hard for arguments, but we

4    were able to have a good argument today.  I appreciate it.

5    I appreciate the arguments of all counsel.

6              I will take it under advisement.  And I plan to

7    issue opinions.  I think what I will likely do is probably

8    issue a shorter, quicker opinion on the Barracuda motion in

9    the near term and I will try to get to the 101 motion as

10   soon as I can.  But in any event, hopefully, relatively

11   soon.

12             With that said, I wish everybody a good day and

13   a good week.  Most importantly, good health.  And we'll

14   prepare to go off the record and end our Court hearing

15   today.  So the Court will stand in recess.  Thank you.

16             (Hearing concluded at 2:17 p.m.)

17                         -   -   -

18

19

20

21

22

23

24

25